## COURT OF APPEALS.

### July 13, 1923.

## THE PEOPLE v. WILLIAM M. CREASY.

### (236 N. Y. 205.)

(1) MURDER IN FIRST DEGREE—DUTY OF COURT OF APPEALS TO REVERSE JUDGMENT OF CONVICTION, IRRESPECTIVE OF EXCEPTIONS, WHERE CONVICTED DEFENDANT DID NOT HAVE FAIR TRIAL.

Where the Court of Appeals, upon consideration of the record in a capital case, reaches the conclusion that the defendant did not have a fair trial and that errors of such a substantial character as to prejudice his rights were committed, the statute (Code Crim. Proc., § 528) imposes the duty of reversing a judgment of conviction and ordering a new trial irrespective of whether or not exceptions were taken.

(2) SAME—REVERSIBLE ERROR FOR PROSECUTING ATTORNEY TO REFRAIN FROM CONVEYING TO THE COURT INFORMATION DURING TRIAL, WHICH MADE TESTIMONY PREVIOUSLY INTRODUCED BY HIM INADMISSIBLE.

Where, as bearing upon the question of motive, there was introduced in evidence on the part of the prosecution a letter purported to have been written by the girl, for whose murder defendant was on trial, and thereafter a witness was permitted to testify to the contents of a certain correspondence card on the theory that it was in the same handwriting as the letter, it is reversible error for the prosecuting attorney to refrain from conveying to the court information which came to him during the trial proving that the letter was not in the handwriting of the defendant.

(3) SAME—ERROR TO PERMIT EXPERT WITNESSES TO TESTIFY THAT IN THEIR OPINION THE WOUND WAS NOT SELF-INFLICTED.

It was for the jury to say whether decedent committed suicide or the defendant killed her. To permit, therefore, expert witnesses to testify that in their opinion the wound was not self-inflicted constituted substantial error.

(4) SAME—ERROR FOR THE COURT TO REFUSE TO CHARGE THAT THE JURY WAS BOUND TO PRESUME THAT DECEDENT COMMITTED SUICIDE UNTIL IT WAS PROVEN BEYOND A REASONABLE DOUBT DEFENDANT WAS PRESUMED NOT TO HAVE KILLED DECEDENT.

It was error for the court to refuse to charge that the jury was bound to presume that decedent committed suicide and did not come to her death at the hands of defendant. Until it was proven beyond a reason-

able doubt defendant was presumed not to have killed decedent. The presumption that one does not take his own life does not apply in a capital case.

(5) SAME—ERROR TO RECEIVE IN EVIDENCE LETTER WRITTEN BY DECEDENT TO THIRD PARTY CONTAINING ALLEGED STATEMENT BY DEFENDANT.

The reception in evidence of a letter written by decedent to a third party reciting an alleged statement by defendant was error. The statement was ex parte, made without the knowledge or consent of the defendant, and in no way binding upon him.

(6) SAME—ERROR TO PERMIT WITNESS TO TESTIFY TO PARTS OF LETTERS OF DEFENDANT TO DECEDENT WHICH SHE CLAIMED TO HAVE READ.

It was also error to permit a witness for the People to testify that when she was assisting decedent to destroy letters of defendant she saw in one or more of them expressions similar to that in the letter of decedent, where she further testified that she was not permitted to read the entire letters but simply the expressions to which she referred. Garbled extracts from letters or documents are not receivable in evidence since the balance of such letters or documents might entirely destroy or explain the expressions used.

(7) SAME—TESTIMONY AND STATEMENTS IN SUMMATION BY PROSECUTING ATTORNEY REQUIRING REVERSAL ON GROUND DEFENDANT DID NOT HAVE FAIR TRIAL.

The introduction in evidence by the prosecution of testimony of alleged statements made by defendant, after being taken into custody, as to his relations with decedent, which statements, if made, the district attorney knew were not true, together with testimony of possible improper relations of defendant with other women, of his personal habits, and that he had in his possession an article which might be used to prevent conception, and comment thereon by the district attorney in his summation, which testimony and comment had no bearing upon the issue and the only possible effect of which was to prejudice the jury against the defendant, require a reversal of the judgment of conviction upon the ground that defendant did not have the fair trial insured by law to every person accused of the commission of a crime. It was also unjustifiable for the district attorney in his summation to single out jurors and call them by name.

(8) SAME.

Nor is this affected by the fact that some of the evidence was stricken out before the close of the trial and the jury told to disregard it where it cannot be said with any degree of certainty that the jury did disregard it or that such evidence did not materially affect its verdict.

(Argued May 9, 1923; decided July 13, 1923.)

APPEAL from a judgment of the Nassau County Court rendered October 7, 1922, upon a verdict convicting the defendant of the crime of murder in the first degree.

*Henry A. Uterhart* and *Alfred M. Schaeffer,* for appellant. The prosecution failed to prove the defendant's guilt beyond a reasonable doubt; and the weight of evidence clearly established his innocence. (Kinney v. Flynn, 11 R. I. 319; Fontana v. Fontana, 182 App. Div. 717; People v. Buffoni, 214 N. Y. 53; Daniel v. Conner, 6 Ky. Op. 32; Williams v. Commr., 37 S. W. 680; Roberts v. N. Y. E. R. R. Co., 128 N. Y. 455.) The court erred in permitting Dr. Jaques, Dr. Schultze and William A. Jones to testify as experts that, in their opinion, Edith Lavoy did not commit suicide. (Moran v. Standard Oil Co., 211 N. Y. 187; Ramapo Mfg. Co. v. Mapes, 216 N. Y. 362.) The trial court erroneously permitted the district attorney to state in his opening that he would show that the defendant had falsely stated that he had had sexual intercourse with the deceased. (People v. Buffom, 214 N. Y. 53; People v. Molineux, 168 N. Y. 264; People v. Becker, 210 N. Y. 274; People v. Conrow, 200 N. Y. 356; People v. Manganaro, 218 N. Y. 9.) The cross-examination by the district attorney was allowed to proceed beyond all reasonable bounds and he was permitted to multiply questions as to acts of collateral misconduct solely for the purpose of prejudicing the jury against the defendant. (People v. Slover, 232 N. Y. 264.) The summation of the district attorney was a heated appeal to the prejudice and passion of the jury, containing statements not supported by the evidence, and presents reversible error. (People v. Fielding, 158 N. Y. 542; People v. Grunwald, 115 N. Y. 520; People v. Mull, 167 N. Y. 247; Bessetti v. State, 101 Ind. 85.) The refusal of requests to charge made on behalf of the defendant by the trial court constituted reversible error. (People v. Dinser, 192 N. Y. 80; People v. Knapp, 42 Mich. 267; Don-

aldson v. Commr., 95 Pa. St. 21; Montana v. Hanna, 5 Mont. 248.)

*Charles R. Weeks, District Attorney (Charles I. Wood,* of counsel), for respondent. The guilt of the defendant was conclusively proven beyond a reasonable doubt and the verdict of the jury should be conclusive. (People v. Becker, 215 N. Y. 126; People v. Sanducci, 195 N. Y. 361; People v. Sutherland, 154 N. Y. 345.) It was not error to receive in evidence the opinion of experts as to whether the wound was self-inflicted. (Van Wycklen v. City of Brooklyn, 118 N. Y. 424; Dougherty v. Milliken, 163 N. Y. 527; People v. Fish, 125 N. Y. 136; Harrison v. N. Y. C. & H. R. R. R. Co., 195 N. Y. 86; People v. Willson, 109 N. Y. 345; Johnson v. S. G. & L. Co., 146 N. Y. 152; Gardiner v. People, 6 Park. Cr. 155; Washburn v. Nat. Accident Society, 57 Hun, 585; State v. Lee, 65 Conn. 265; Miller v. State, 9 Okla. Cr. 255.) The court did not err in admitting secondary evidence of the contents of letters written by the defendant to the deceased which had been destroyed. (Steele v. Lord, 70 N. Y. 280; Mason v. Libbey, 90 N. Y. 683; Dearing v. Pearson, 8 Misc. 269; Rosenbaum v. Podolisky, 97 Misc. 614.) The summation of the district attorney was in all respects proper, and contained nothing prejudicial to the defendant and requiring reversal. (People v. Esposito, 224 N. Y. 370; People v. Manganaro, 218 N. Y. 9; People v. Wolf, 183 N. Y. 64; People v. Mull, 167 N. Y. 247; People v. Fielding, 158 N. Y. 542; People v. Slover, 232 N. Y. 264; People v. Dixon, 231 N. Y. 111; People v. Watson, 216 N. Y. 565; People v. Hartigan, 210 N. Y. 144; People v. Conklin, 175 N. Y. 333.) The trial court did not err in its charge as given, nor in its refusals to charge. (People v. Radcliffe, 232 N. Y. 249; People v. Sutherland, 154 N. Y. 345; Hendrickson v. People, 10 N. Y. 31; People v. Ferraro, 161 N. Y. 365; People v. Seppi, 221 N. Y. 62; People v. Sanducci, 195 N. Y. 361; People v. Farmer, 194 N. Y. 251; People v. Feigenbaum, 148

N. Y. 636; People v. Johnson, 139 N. Y. 358.) Where it appears that a violent death is the result either of accident or suicide, the presumption is against suicide. (Mallory v. Travelers' Ins. Co., 47 N. Y. 52; Bernard v. Protected Home Circle, 161 App. Div. 59; De Van v. Com. Trav. Soc., 92 Hun, 256, 157 N. Y. 690; Travelers' Ins. Co. v. McConkey, 127 U. S. 667; Peck v. Equitable Acc. Assn., 52 Hun, 255; Germain v. Brooklyn Life Ins. Co., 26 Hun, 604, 30 Hun, 535; Hodgson v. Preferred Acc. Ins. Co., 182 App. Div. 381; Herschkowitz v. Mutual Life Ins. Co., 93 Misc. 522; Butterfield v. State, 118 Misc. 273; White v. Prudential Ins. Co., 130 App. Div. 260; Landon v. Preferred Acc. Ins. Co., 43 App. Div. 487.)

McLAUGHLIN, J.:

About 10:30 o'clock in the evening of June 23, 1922, Edith Lavoy, a teacher in one of the public schools of Freeport, N. Y., died in an apartment occupied by her. Her death was caused by a bullet fired from a twenty-five calibre automatic revolver which entered her right temple about two and one-half inches in front of and two inches in a perpendicular line above the opening or auricular canal of the right ear. The course of the bullet was inward, backward and upward. It passed through the brain to a point about three inches above the auricular canal of the left ear and one and one-half inches back of it, and lodged in the inner side of the skull. Death was almost instantaneous. The only persons in the room when the shot was fired were the defendant and Miss Lavoy. The revolver belonged to him. He either shot her or she committed suicide. This was the question for the jury to determine. The district attorney so stated in his summation, as did the learned trial judge in his charge. Defendant was immediately taken into custody, subsequently indicted, tried and convicted of murder in the first degree.

The question presented to this court by the appeal is whether

defendant had a fair and impartial trial and his conviction were obtained by legal evidence.

After a very careful consideration of the voluminous record I have reached the conclusion that he did not have a fair trial and that errors of such a substantial character as to prejudice his rights were committed.

In a capital case the statute imposes upon this court, under such circumstances, the duty of reversing a judgment of conviction and ordering a new trial, irrespective of whether or not exceptions were taken. (Code of Criminal Procedure, § 528; People v. Jung Hing, 212 N. Y. 393; People v. Jackson, 196 N. Y. 357, 362; People v. Fielding, 158 N. Y. 542.)

It is necessary, in order to indicate what seem to me to be some of the errors, and the unfairness of the trial, to state a few of the facts. Miss Lavoy was graduated from one of the normal schools of the State when about twenty years of age and thereafter accepted a position as teacher in a public school in the city of Gloversville, N. Y., where she taught about two years. While there, she and the defendant, who was then about twenty-eight years of age, became acquainted through a matrimonial correspondence club. In his written application for membership therein he stated that he had never been married, which was untrue, as he was at that time living separate and apart from his wife, she having obtained a judgment of separation. He was a person of limited education, ordinary ability, and moral character not above reproach. The superintendent of the club called Miss Lavoy's attention to him, and she thereupon wrote him the following letter:

"26 Allen St.,
"GLOVERSVILLE, N. Y.,
"March 20th, 1920.

"DEAR SIR.—As you have been recommended to me by the Standard Correspondence Club, Graylake, Ill., as a gentleman matrimonially inclined and desiring lady correspondence with

that object in view, and under recommendation of J. W. Schlosser, who sent me your description, I beg permission to open correspondence. If this meets with your approval I will be pleased to hear from you in return. Thanking you in advance,

" I am yours respectfully,<br>" (Miss) EDITH E. LAVOY."

Defendant answered this letter and the correspondence, opened in this informal way, soon ripened into a strong attachment. Her letters, many of which were introduced in evidence, indicate she was a highly emotional, hysterical and romantic girl. Only a few of his letters were introduced in evidence, the People's witness Mrs. Sheldon testifying that a few days before Miss Lavoy's death she assisted her in destroying them.

After completing her engagement in Gloversville, she accepted a position as a teacher at Freeport, N. Y., and at the time of her death had about finished her second, and entered into a contract for another year. In October, 1920, defendant, who was then employed in a railroad repair shop in Kentucky as a machinist, at Miss Lavoy's invitation, went to Freeport and for the first time they met. This visit, as indicated by her letters following his return to Kentucky, seems to have increased the favorable impression she had previously formed of him by their correspondence. He again visited her in Freeport in January and April, 1921, and in August at her home in Tupper Lake, N. Y., when their engagement was formally announced by, and with the consent of, her parents. Upon his return to Kentucky he sent her a diamond engagement ring. In September, 1921, she returned to her school at Freeport but he did not see her again, though frequent letters passed between them, until February, 1922. Upon this visit, their marriage, which, according to his testimony, was to have taken place in July, 1922, was postponed for a year, and this fact was cor-

roborated by one of her letters. On the 19th of March, 1922, she wrote him a very affectionate letter and following its receipt, according to the defendant, either the last of March or early in April, he wrote her he thought they better stop corresponding; that he then, for the first time, told her of his former marriage and divorce; that she, evidently not believing what he had written, asked him to come to Freeport to see her. On the 23d of April he wrote her a letter which was introduced in evidence, which would seem to indicate she had theretofore written him breaking the engagement. It is a rambling, in many respects incoherent letter, and he testified that it was written at a time when he was getting over a period of intoxication. The substantial part of it would seem to indicate he told the truth. In any event, he went to Freeport, reaching there on the 30th of April or 1st of May. It was during this visit they went, at her suggestion, to a place designated in the record as the " Kissing Bridge," and while there, or in that vicinity, he said they indulged in target practice with the revolver which subsequently caused her death; that on their way back to her apartment, a dog grabbed hold of his coat and he took the revolver from his pocket for the purpose of shooting it; that she then got possession of the revolver and retained it until about the 1st of June following; that he told her at that time what he had previously written her, that he could not marry her; that the judgment of separation from his wife had not been made a final judgment of divorce and he did not want her to write him any more. As to this he was corroborated by a special delivery letter from her, mailed on the 12th of May, in which she said: " Dear Billie— You said you didn't want me to write any more, so am just saying good night." The following day he telegraphed her, asking why she did not write him, saying he had been to the races and lost his last dollar. He was corroborated as to her having possession of the revolver by several of her letters, in which she promised to return it, and on June 1st he telegraphed her as follows: " Edith, I would feel better satisfied if you

34

would send me that gun you have so often promised. You know why." On June 4th she acknowledged receipt of the telegram, and at the same time said she had sent it to him.

Her letters to him from the latter part of May down to about the time of her death indicate she was very unhappy and despondent, expressing several times a wish that she " could die and end it all."

The defendant testified that a strike had been called in the shop where he was employed, which was to begin on the 1st of July; that in view of that fact he decided to quit his employment in the Kentucky shop, go to Montreal and obtain a position there if he could; that he accordingly packed his trunk, dress-suit case and a grip, and in the latter put all of Miss Lavoy's letters which he had previously tied up, and all of the things she had given him, with the intention of going to Freeport and returning them to her before going to Montreal; that he checked his trunk to the Grand Central station, in New York, took his suitcase and grip with him, and started for New York; that when he reached there he checked his grip, took the suitcase and went to Freeport; that he there hired a room in a boarding house, and about 12 o'clock went to Miss Lavoy's school and remained with her during the noon intermission, they lunching together, she having sent out for some sandwiches and a pie; that he then made an arrangement to call on her that evening at her apartment, which he did, and remained with her until about 10 o'clock; that he then went to his room, where he remained until the following morning, when he met her on the street and went with her to the school; that he then arranged to call on her that evening and on the next day to go with her to New York; that after leaving her at the school he went to the Grand Central station, got his grip and took it to the Pennsylvania station, where he checked it; that he did this for the purpose of having it conveniently near when they reached the city the following day, when he was going to return to her her letters and the things she had given him; that after checking

his grip he went back to Freeport and that evening called upon her about 7:30 o'clock; that when he called, People's witness Mrs. Sheldon, her room-mate, was present; that the three remained in the room some time when Mrs. Sheldon went out, returning between 9 and 9:30, when she remained in the room for a few minutes and then went into the adjoining room and retired; that after Mrs. Sheldon went out, and before she returned, he and Miss Lavoy laid down on a sofa in the sitting room; that they there remained until they heard Mrs. Sheldon coming in, when they got up and sat on the side of the sofa, and after she retired they again laid down on the sofa.

The apartment occupied by Miss Lavoy and Mrs. Sheldon was on the second floor of a rooming house for teachers. Mrs. Sheldon and Miss Lavoy had a sitting room, where the shooting took place, a bedroom adjoining, through which access was had to their bathroom; in the sitting room was a sofa, upon which was a cover or spread, with some pillows or cushions at its head; about eight or ten feet from the head of the sofa was a chair, and a little further away a desk. Across the hall from the sitting room was a bedroom occupied by People's witness Miss Duby. According to defendant's testimony, he took off his coat early in the evening and hung it on the back of the chair in the sitting room; that after Mrs. Sheldon had retired he and Miss Lavoy laid down on the sofa, she on the inside and he on the out; that after lying there a short time she got up, went into the bathroom, and got a glass of water, part of which she drank and he the rest; that after she drank the water she placed the glass on the stand or desk near where his coat was; that he then asked her to bring him some cigarettes which were in his coat pocket; that she did so and they then laid down on the sofa in a position similar to the one in which they were before she got the water; that Miss Lavoy was lying partially on her left side, with her face on or partly on his; that he was lying on his stomach or right side, with his right arm under his head or on the pillows on the sofa, and his left arm over

her; that he partially dropped asleep and while in this posi-
tion he was suddenly startled by the report of a revolver; that
he immediately got up from the sofa, ascertained she was un-
conscious, and saw blood running across her forehead from the
right side towards the left and down over her left eyebrow;
that he immediately went into Mrs. Sheldon's room and said
to her: "My God, Edith has shot herself;" that Mrs. Sheldon
immediately went into the sitting room and he then went to
Miss Duby's room and told her the same thing; that he then
ran downstairs and told Miss Smith, the keeper of the rooming
house, and a Miss Walsh, who was sitting on the piazza with
her, of what had occurred and asked them to send for a doctor,
which they did by telephone. His testimony in this respect is
corroborated by such persons, Mrs. Sheldon testifying that she
was awakened by the report of the revolver and " almost in-
stantly the door was opened and Billy stood at the foot of the
bed calling me. He said, ' Mildred, Oh, my God, Mildred,
Edith has shot herself.' "

Dr. Runcie, the health officer of the village of Freeport and
attending surgeon of the Nassau Hospital, and Dr. Newton, a
practitioner in Freeport and attending surgeon at Mercy Hos-
pital, at Hempstead, responded to the call. Both doctors
arrived about the same time and within three or four minutes
after the shooting took place. People's witness Stevens, a
passerby, entered the room about the same time, or shortly
before the doctors arrived. Both doctors, and the witnesses
Stevens and Duby, all agree as to the position of the body when
they entered the room, which was substantially the same as the
defendant testified it was in when he got up from the sofa.
They testified that Miss Lavoy was lying on her left side, with
her right arm across her body, her face turned towards the left
side, and the revolver was lying on the sofa underneath her
right hand, between the hip and waist line; that the shell from
which the bullet was fired was found near the center of the
room, a few feet from and in front of the sofa; that blood was

flowing from her right temple across her forehead and left eye-
brow, and dropping down on the sofa; that neither her clothing
nor the cover or pillows on the sofa were disarranged; and
there was nothing to indicate that a struggle had occurred, or
that the body had been moved after the shot was fired, except
Doctors Runcie and Newton testified they turned the head to
the right to determine if the bullet had come out on the other
side, and in doing so the course of the blood was changed and
ran down on the right side; that at this time the defendant was
sitting in a chair, apparently sobbing and in a very hysterical
condition, which, according to Dr. Runcie, was " perfectly gen-
uine," though there was testimony offered by the People that
it was not.

Within a very few minutes after the shooting, police officers
and detectives arrived and they took the defendant into custody.
The assistant district attorney arrived shortly thereafter. The
defendant was taken into a room at the rear of Miss Duby's
room, and there subjected for several hours to a searching
examination as to his relations with Miss Lavoy and the facts
connected with the shooting. After such examination he was
taken to the district attorney's office, where he was again ques-
tioned, and subjected to an examination not only by such
officers, but by one Fogarty, who searched him. Fogarty was
an ex-member of the police force of the City of New York and
was, at the time, acting for the district attorney. In the early
morning of the 24th of June, while still in the district attorney's
office, he was again interrogated by the district attorney and his
assistant. In the statements made to the police officers, detec-
tives and Fogarty, it is claimed by them that defendant stated
he had been intimate with Miss Lavoy on several occasions.
The fact that he made such statements, or that he had been
intimate with her, was positively denied by him at the trial
and to the district attorney when he interrogated him prior
thereto. If such statements were made, the same were untrue,
and that fact was conclusively demonstrated by the autopsy,

because she had never been intimate with him or any other man; that at the time she died she was a virgin. The district attorney made much of defendant's alleged statements as to his intimacy with her in his opening and closing to the jury.

After the defendant had been taken to the district attorney's office and searched, there was found in one of the pockets of his coat an article which could be used to prevent conception. This article was introduced in evidence and commented upon in a manner hereafter stated by the district attorney in his summation to the jury. No proof whatever was offered that Miss Lavoy ever saw this article, knew that he had it, or that he ever attempted to use it.

The question which was submitted to the jury, and the sole question as I have already indicated, was whether the defendant killed Miss Lavoy or whether she killed herself. All the evidence was for the purpose of enabling the jury to determine that issue. The broken engagement was the only suggestion of a motive, either on the part of the defendant to kill Miss Lavoy, or on her part to take her own life. As bearing upon the question of motive on the part of the defendant, there was introduced in evidence People's Exhibit 32, a letter alleged to have been written by Miss Lavoy to the defendant in answer to a telegram from him, in which he stated he had lost his last dollar at the races. This letter was received in evidence upon the positive and unqualified testimony of People's witness Miss Shoemaker, who was the principal of Miss Lavoy's school, that it was in her handwriting. It is the only letter produced which, in any way, indicates that the engagement was broken by Miss Lavoy. This exhibit, therefore, became a very important piece of evidence. It reads as follows:

" DEAR BILLIE.—Your letter rec'd. today, and I have no words in which to tell you how surprised and shocked I am to know of the state you must be in to do the things you are doing.

" Now for your own sake as well as mine, pull yourself together and go back to your job—settle down to work again

and let Time settle the rest. Perhaps you don't realize how all this is affecting me—you worry me and it is having its effect on my health.

" When you are calmer and yourself again, you will realize how honest I have been with you—do you think it quite right to blame me for that very honesty?

" Can love be forced?

" Would you want a wife who did not love you?

" As for the gun, I will take good care of it & keep it for you.

" Billy, you say you love me—if you do, you will do no rash and wicked thing—that is not the way out for a strong man and a soldier. That is the way of a coward or a weakling— one afraid to face life. In the old days, I tho't you a strong man—not a weakling—*don't* make me know that I was mistaken. I am sorry that you *lost* the money but why be so foolish—go back to your job and *work*—that will help you more than any other thing. Billie, I am sorry for all this, but, again, brace up and do your part—we all have to.

" Write me again soon. I sincerely hope that the letter will tell me that you are working and your normal self again.

" I am sending you my best thoughts and praying that God will open your eyes to *the right.* Sincerely, Me."

After this letter had been received in evidence, the People's witness Mrs. Hurt, the keeper of a boarding house at Bellevue, Ky., where the defendant boarded for something like a year, was permitted to testify that on the 20th of June, 1922, he left her house, saying he was going to Montreal, Canada; that about the day he left she saw, on the dresser in his room, a correspondence card; that when he left the card disappeared. She was then shown People's Exhibit 32 and testified that it and such card were in the handwriting of the same person. She was asked to state the contents of the card, and on the theory that it was last seen in defendant's room the day he started for New York, was permitted to do so, against the objection and excep-

tion of defendant's counsel.   She said it was postmarked "Freeport" and signed "Edith," and that the part which she remembered read: "Dearest Billie, Here is where I am saying goodbye forever."   Defendant's counsel was also denied the privilege of cross-examining her as to her qualifications to testify as to Miss Lavoy's handwriting.   The importance of this piece of evidence can at once be appreciated.   It indicated, especially when read in connection with People's Exhibit 32, that the engagement was broken not by defendant, but by Miss Lavoy.   It also indicated a possible inference by the jury of a motive on the part of the defendant.

Defendant's counsel, in his opening to the jury, stated he would prove that People's Exhibit 32 was not in Miss Lavoy's handwriting and that defendant never received it.   He did prove, clearly and conclusively, that it was not in Miss Lavoy's handwriting and I am of the opinion the defendant never received it.   He testified it was not in Miss Lavoy's handwriting and he had never received it, or had it in his possession. Mr. Horton, a well-known handwriting expert, testified it was not in her handwriting and his testimony demonstrates it to a certainty.   There are set out in the papers used on the motion. for a new trial photographic copies of her concededly genuine handwriting, as well as Exhibit 32, and an inspection thereof indicates that it did not need a handwriting expert to determine that Miss Lavoy never wrote Exhibit 32.   Not only this, but after defendant's counsel had stated he would prove it was not in her handwriting, according to his affidavit used on the motion for a new trial, the district attorney said to him, after the opening, that if he put a handwriting expert on the stand to testify it was not in Miss Lavoy's handwriting, he, the district attorney, would produce Mr. Carvalho, a well-known expert, who would testify it was.   After Mr. Horton had testified that Exhibit 32 was never written by Miss Lavoy, the district attorney employed Mr. Carvalho to determine whether or not she had written it.   This was while the trial was in progress and

before Mr. Horton had completed his testimony. Mr. Carvalho, in his affidavit used on the motion for a new trial, among other things, stated that he was employed by the district attorney to examine People's Exhibit 32 in connection with concededly genuine specimens of Miss Lavoy's handwriting, and also Miss Shoemaker's; that his examination led him to the conclusion that Miss Shoemaker was the author of Exhibit 32, and he so informed the district attorney or his assistant; that after reaching such conclusion he asked Miss Shoemaker if she had written it and she stated that she had not; that he then asked her to furnish him with some new specimens of her handwriting, written at his dictation, which she did, and after examining such specimens he stated to her: " You wrote this People's Exhibit 32; " that thereupon said Edna M. Shoemaker denied to deponent that she had written it; and that deponent then called Assistant District Attorney Edwards and, pointing to Edna M. Shoemaker, stated to Mr. Edwards, * * * There is the author of this letter. That Mr. Edwards then turned to Edna M. Shoemaker and said * * * ' We want the truth here; did you write that letter? ' and that Edna M. Shoemaker then admitted that she had written People's Exhibit 32." Notwithstanding the information which the district attorney had thus obtained that Exhibit 32 was not in Miss Lavoy's handwriting, and that the contents of the correspondence card as testified to by the People's witness Hurt had been erroneously admitted, on the theory that it was in the same handwriting as Exhibit 32, and that such exhibit was in Miss Lavoy's handwriting, nevertheless the information was not conveyed to the court and no effort was made to have Exhibit 32 or the contents of the correspondence card stricken from the record.

This constitutes what I designate as error number one, which in and of itself, and independent of any other error, necessitates a new trial. This was an error so fundamental, so substantial, that a verdict of murder in the first degree ought not to be per-

mitted to stand.    No one can say that a verdict of guilty would have been rendered if such evidence had not been received.

In addition to this error I am of the opinion one equally substantial was committed in permitting People's witnesses Jones, and Doctors Jacques and Schultze to testify, against the objection and exception of defendant's counsel, that in their opinion the wound was not self-inflicted.    This was equivalent, under the facts of this case, to permitting them to testify the defendant was guilty.    The fact that Miss Lavoy came to her death by the bullet wound in her head while she and defendant were alone in the room was not disputed.    The sole question, as before indicated, was whether defendant or she fired the fatal shot.    The district attorney, in his summation to the jury, so stated.    He said: "And finally, gentlemen, lastly, you may say, the proposition in this case is simply this.    Either Miss Edith Lavoy shot herself that night or William M. Creasy, this defendant, killed her."    The trial judge, in his final instructions to the jury, said: "The question in this case, and the only question, comes down to a very clear issue, that is, did Edith Lavoy kill herself, or did the defendant kill her?"    This was the ultimate fact which the jury had to determine and they were just as competent to do so as were the so-called experts. The revolver from which the bullet was fired had been produced.    It had been made to appear that it was not a contact wound.    The place where the bullet entered the head, as well as its course, and where it finally lodged, had been testified to. From these facts, and the others developed at the trial, it was unquestionably and without the slightest doubt for the jury to say whether Miss Lavoy committed suicide or the defendant killed her.    Facts are the appropriate subject of evidence. Inferences and conclusions to be drawn therefrom are for the jury.    Opinion evidence is never allowed, except when from the nature of the case the facts cannot be stated in such a manner as to enable the jury to form an accurate judgment therefrom, and no better evidence than such opinions is obtainable.

(Noah v. Bowery Savings Bank, 225 N. Y. 284; Schutz v. Union Ry. Co. of N. Y. City, 181 N. Y. 33; People v. Underhill, 142 N. Y. 38; Ferguson v. Hubbell, 97 N. Y. 507; Keefe v. Armour & Co., 258 Ill. 28; People v. Curtright, Id. 430; Hite v. Keene, 149 Wis. 207; 1 Greenleaf on Evidence, § 440 and note.)

This was not a technical error, but one so fundamental and substantial that it might, and undoubtedly did, influence the jury in reaching its verdict.

Next, I think the court erred in refusing to charge the following request, to which an exception was taken: " I ask your Honor to charge that since the defendant is presumed to be innocent until proven guilty beyond a reasonable doubt, the jury are bound to commence their consideration of the evidence in the case by a presumption that Edith Lavoy committed suicide and did not come to her death at the hands of this defendant." The defendant was presumed not to have killed Miss Lavoy until it had been proven beyond a reasonable doubt. It is true there is a presumption that one does not take his own life. This rule has usually been applied in life insurance and accident cases. It has never been applied, so far as I have been able to discover, in a capital case. Certainly the presumption as to the living is greater than as to the dead, and every presumption is to be indulged in as to the former as against the latter. The dead need no presumption; the facts as to them are fixed, upon which time has placed an unchangeable and immutable end; the living do. This request, in my opinion, should have been charged. To refuse it was equivalent to denying to the defendant the mantle of protection which the law gave him and allowed the jury to commence its deliberations without a presumption in favor of his innocence. This was wrong and the trial court should have appreciated the force of the request and charged as requested.

I am also of the opinion the court erred in admitting in evidence the letter written by Miss Lavoy to Dan Sherman (Peo-

ple's Exhibit 21). This letter was written on May 1, 1922, when defendant was visiting her in Freeport. In it, after stating that defendant was there, she said: " He said he came up here with only two objects in mind. To live with me or die with me and there had to be a decision before sun-down." No one can possibly tell what effect this had upon the jury. It was an ex parte statement, made without the knowledge or consent of the defendant, and in no way binding upon him. It ought not to have been received. It is true no objection, for some unexplained reason, was made to its reception in evidence, but notwithstanding that fact this court cannot overlook the error.

It was equally erroneous to permit People's witness Mrs. Sheldon to testify that when she was assisting Miss Lavoy in destroying defendant's letters she saw in one or more of them expressions similar to that contained in Miss Lavoy's letter to Sherman. Mrs. Sheldon testified she was not permitted to read the entire letters, but simply the expressions to which she referred. Garbled extracts from letters or documents are not receivable in evidence, since the balance of such letters or documents might entirely destroy or explain the expressions used.

There are other alleged errors, but it is unnecessary to consider them, since they may not occur on another trial. Those pointed out seem to me to require a reversal of the judgment of conviction.

Finally, I am of the opinion the judgment of conviction must be reversed because the defendant did not have a fair trial. The law insures to every person accused of the commission of a crime a fair trial, and by that is meant, according to rules of the common law, except in so far as the same have been modified by statute.

The defendant, after being taken into custody, according to the testimony of certain witnesses for the People, stated that he had been intimate with Miss Lavoy on several occasions. Prior to the trial he told the district attorney he had never made such statements, that they were not true, and he so testified at the

trial. The district attorney knew at the time of his opening that the statements were not true and that the autopsy had clearly and conclusively established that fact. The only possible purpose, therefore, in calling the jury's attention at the beginning of the trial to the fact that defendant had made such statements, was to create a prejudice against him. The proof offered by the district attorney as to defendant's making such statements was for the same purpose. In saying this I do not mean that it would not have been proper to have questioned the defendant, on cross-examination, with reference thereto for the purpose of testing his credibility. The proof to which I refer was offered in the first instance as a part of the People's case.

The district attorney also overstepped the line of fairness when he got before the jury the fact that defendant had married a girl seventeen years of age and within four or five months thereafter she had a child; that he had, on one occasion, gone to a hotel with a married woman and registered as man and wife, for which he was arrested and subsequently made correspondent in an action for divorce brought by the husband; that he had certain disgusting personal habits; and that when he was searched, after being taken into custody, there was found in one of the pockets of his coat an article which might be used to prevent conception. That the district attorney made effective use of this article in his summation can be appreciated by a short quotation therefrom. He said: " He came up here with the implement of his trade, which he had in his pocket. What respectable man carries those damnable things around with him, tell me? Did you ever know anybody of your own acquaintance to carry those things with him? What do you suppose he came up here armed with that devilish thing for, if it was not to help him carry out his purpose and ruin this Lavoy girl, if possible? Thank God, he could not do it and thank God she died a virgin. But his purpose was apparent just the same. He came for that, but he could not carry it out and then like the coward who killed with a kiss, he sneaked

around behind her as she was in some position there—because I was not there and I could not tell you—he no doubt got her down in some position and with this revolver, where she did not see it, he let it go, like the coward, I say, who killed with a kiss; whereas a brave man kills with a smile." This article had no bearing upon the issue being tried, no proof was made that Miss Lavoy ever saw it or knew defendant had it, and its only possible effect was to prejudice the jury against defendant. The statement quoted was uncalled for and unjustifiable. It was equally unjustifiable for the district attorney in his summation to single out jurors and call them by name. Such practice has been condemned in other jurisdictions (Bessette v. State, 101 Ind. 85) and ought not to receive the approval of this court.

It is true that the evidence as to some of the things which I have indicated as showing unfairness was, before the close of the trial, stricken out and the jury told to disregard it, but it is impossible to tell to what extent they may have influenced the jury. It certainly cannot be said with any degree of certainty that the jury did disregard them, or that such evidence did not materially affect its verdict. (People v. Fielding, supra, at p. 551; People v. Corey, 157 N. Y. 332, p. 346; Brooks v. Rochester Ry. Co., 156 N. Y. 244, p. 252; People v. Florina, 232 N. Y. 545.)

For the foregoing reasons I am of the opinion the judgment of conviction should be reversed and a new trial ordered.

HISCOCK, Ch. J., HOGAN and ANDREWS, JJ., concur; CARDOZO, J., concurs in result in memorandum as follows:

CARDOZO, J., concurs in the result upon the ground that justice requires a new trial: First, because of the error of the court in receiving in evidence as proof of motive an instrument to prevent conception found in the defendant's pocket; second, because of the failure to strike from the record the statement of the witness Hurt as to the contents of a postal card, after the

progress of the trial had demonstrated that the supposed basis for her knowledge of the defendant's handwriting was unreal; and, third, because of possible misconception by the jury as to the authorship of People's Exhibit 32, and the omission of the trial judge to avert such misconception by adequate instructions.

POUND and CRANE, JJ., dissent and vote for affirmance under provisions of section 542 of the Code of Criminal Procedure.

Judgment of conviction reversed, etc.