Abraham N. Geller, J.
Petitioner Podinker moves for a writ of error coram nobis to vacate and set aside his conviction for the crime of murder in the first degree. The basis of the motion is essentially that the conviction was procured by perjurious testimony known to be such by the prosecution. On the basis of the hearing had on the motion (hereinafter “ hearing ”) as well as the able, extensive oral argument and briefs by both sides, the court feels constrained to grant the motion.
Petitioner was indicted on March 24, 1942 along with one Peller and Popek, who testified for the People and allegedly committed the perjury in question. It appears that Popek, who was then serving a sentence in Clinton Prison on another conviction, agreed to testify for the People before the Grand Jury and at the trial (hereinafter “ trial ”), and on October 29, 1942 Ms case was severed. Both Podinker and Peller were convicted of murder in the first degree on December 1,1942. On December 8,1943 the Court of Appeals unanimously reversed as to Peller, ordering a new trial, and by a vote of 5 to 2 affirmed as to Podinker. (People v. Peller, 291 N. Y. 438.) The importance of Popek’s testimony in the conviction of his two codefendants was noted by the Court of Appeals as follows (p. 441): “At the trial Popek testified for the People and his testimony, corroborated by the testimony of Sidney Newburg and Jack Lieberman, constituted the chief basis for the verdict of guilt.” Further light is shed on the witness Popek by the following memorandum by the dissenting Judges, Lottghran and Desmond (p. 448): ‘1 If there is to be a new trial here, it should be on the firm ground that the People’s witnesses just could not be believed. That requires a new trial for Podinker as well as for Peller, and we so vote.” Judge Rippey concurred with the dissenting Judges on the ground for reversal as to Peller.
Petitioner’s sentence of death was later commuted to life imprisonment, which sentence he is now serving at Green Haven Prison. Peller was permitted in the course of his retrial (hereinafter “ retrial ”) to plead guilty to manslaughter in the first degree and on May 23, 1945 he was sentenced to a term of from seven to eight years. Parenthetically, the sentencing court, the late Judge Donnellan, noted that Peller was receiving consideration because, inter alla, the disreputable character of the People’s witnesses made it uncertain whether a jury would convict and that if it did, whether the Court of Appeals would sustain the conviction. Popek was never tried but was permitted *284 to plead guilty to manslaughter in the first degree on April 1, 1947 and he received a sentence of from 10 to 20 years, which sentence, however, was suspended.
Petitioner now contends that Popek, who fully admitted his participation in the murder, testified for the People in exchange for a promise or understanding on the part of the prosecution that it would recommend to the court a lesser plea and a suspended sentence for Popek. lie further contends that Popek deliberately lied or misled the court and the jury by denying the existence of said understanding and that the prosecution made use of such perjury by failing to disclose the truth.
Petitioner has failed to sustain the burden of proving that Popek had been promised a suspended sentence and that he had lied on that subject in his testimony at the trial. He has sustained his burden, however, with respect to the recommendation of a plea.
Inasmuch as petitioner’s conviction was based principally on the testimony of Popek, an unsavory, disreputable character, the court must indeed scrutinize it carefully to determine whether that witness fully complied with his oath “ to tell the truth, the whole truth and nothing but the truth ’ ’ and whether or not “ (h)ad the jury been apprised of the facts, it would have been in a better position to evaluate his veracity ” (People v. Savvides, 1 N Y 2d 554, 558).
First, I shall deal with the understanding reached by Popek and the prosecution prior to the trial and then deal with Popek’s testimony on that subject.
Since petitioner’s'right to relief turns principally on Popek’s testimony at the trial and the testimony of certain witnesses at the hearing on the motion, it is necessary to quote relevant portions thereof.
The Assistant District Attorney who was then in charge of the prosecution testified for the People at the hearing. In response to a general question on direct examination, he denied that there was any understanding with Popek or any of his counsel to the effect that he would give Popek a lesser plea or that he would see to it that Popek would not serve any additional time by reason of such plea. However, he testified to the contrary during a detailed cross-examination on that subject, as follows:
“ Q. And hadn’t you talked with Mr. Popek about what his fate was to be or what was to be done with him? A. Yes, I did. I told him — do you want what I told him?
‘ ‘ Q. Yes, you tell us. A. I told him that if he cooperated with the People and was willing to testify and tell the whole truth, *285 that the extent of his cooperation would be presented to the Judge who had his case.
‘1 Q. Yes. And you told him, did you not, that if he cooperated with the People and told the truth, that he would not be tried for murder in the first degree, wasn’t that clear? A. No, I do not know that I did that. I said that his case would be severed and he could have a plea to a lesser degree than first degree murder. I didn’t tell him what degree of homicide.
“ Q. Yes, but you did tell him that — A. I said if he cooperated with the People that the extent of his cooperation would be placed before the Judge who handled his case, and that’s all I told him.
“ Q. And you also told him, as you say, that he could take a lesser plea? A. Less than first degree. Of course he couldn’t plead to first degree; that he did not know—'when he went on the witness stand he did not know whether he had to plead to second degree murder or a lesser degree of homicide.” (Emphasis supplied.)
Then, on recross-examination of the assistant at the hearing, there was read into the record portions of Popek’s testimony at the trial denying any understanding with the prosecution and wherein Popek testified that “ the District Attorney told me I would have to take a chance and throw myself upon the mercy of the Court.” Thereafter the afore-mentioned assistant who was testifying for the People herein advised the court that his recollection was refreshed and that he wished to clarify his earlier testimony. He then testified as follows:
“ The Witness: In the minutes of the trial of that murder case, the testimony of Popek which you read —
* * *
“ The Witness :—when he said nothing had been promised, that he would have to take his chances, I’d like to add to my testimony heretofore given that I had been very severe with Popek when he was in my office and I told him that he would have to take his chances and that we would present whatever cooperation he had given to the Court and it would be up to the Court, which of course it was.
“ Q. But, nevertheless, you did tell him—that he would not be brought to trial for murder in the first degree? A. No, I didn?t. I said that he would have to take his chances because I didn’t promise him anything. The only promise I made to Popek was that if he testified for the People the extent of his cooperation loould be brought to the court’s attention for whatever consideration the Court wished to give him.” (Emphasis supplied.)
*286 Considering first the assistant’s testimony on cross-examinatian, he twice states directly that he promised Popek a plea to a degree of homicide less than murder in the first degree but without specifying the exact degree. As to his later testimony on recross, after his recollection was refreshed, the court finds no essential contradiction with the foregoing testimony on cross-examination. The fact is implicit in his answer on recross that he gave Popek to understand that he would recommend a plea, since it is obvious that the court has no discretion with respect to sentence on a conviction for common-law murder and that calling Popek’s co-operation to the court’s attention “ for whatever consideration the Court wished to give him” necessarily assumes a conviction for something less than common-law murder. As to his testimony on direct examination denying any promise, the court gives greater credit to the assistant’s more detailed testimony on cross and recross-examination set forth above than to his afore-mentioned testimony on direct which was in response to two general questions and which encompassed the subject of sentence as well as plea.
The conclusion that there was an understanding is made inescapable by the further testimony at the hearing. Another Assistant District Attorney, who participated in the case in a junior capacity and who is now a Justice of the Domestic Relations Court, testified in a frank and forthright manner as follows:
“ A. * * * and I told him it was his privilege, if he wanted, to tell what he knew about the case, and if he participated in it he would be indicted and that if he testified for the People, I would tell my chief of the Homicide Bureau and tell the Judge who was hearing the case what part he had played in the People’s case and then that the Judge would decide what plea he would have to take and what sentence, that that was completely out of my province; and Popek said that he would think it over and that he would let me know the following day.
“ When we reached New York he was placed in the Tombs and the next day, the 13th, he was brought over to the office of the District Attorney and he told me he was willing to take his chances, and he gave me a statement in the presence of a stenographer and of detectives.” (Emphasis supplied.)
Here too, we find an almost direct acknowledgment that Popek was told that some plea would be recommended for bim and that he was willing to “ take his chances ” on what degree of homicide the court would allow him to plead to and what sentence the court would impose.
*287 Popek’s chief counsel at the trial testified at the hearing concerning a conference on March 30, 1942 with one or both of the afore-mentioned assistants. One of the few matters he was able to testify to from independent recollection was as follows: ££ Q. At the conference in March of 1942 will you just tell us what was said with relation to the disposition of the case of David Popek and, if you can, tell us who said what? A. Mention was made of the fact that David Popek was doing this term of years in State Prison— * * * and that he was to receive
a lesser plea. What the plea was was not decided at that time, hut he was to receive a proper plea and his demands were that—”. (Emphasis supplied.)
Finally, one of Popek’s cocounsel, who later became a Justice of the Municipal Court, testified that in a conference with Popek in early April, 1942, Popek said: ££ They will come across or I won’t testify; I know how to take care of myself. ’ ’ This remark illuminates Popek’s then state of mind and the kind of consideration he was prepared to exact in exchange for his testimony. It also points up quite graphically what is clear from the record: that he was an experienced offender well versed in the procedures of dealing with law enforcement authorities. The relevance of this facet of Popek’s character will become further apparent when we analyze his testimony at the trial.
On the basis of the foregoing testimony, particularly in the context of the entire record, the court finds that the prosecution and the witness Popek had reached an understanding that, in exchange for Popek’s testimony for the People, the prosecution would recommend to the court a plea to a lesser degree of homicide, the exact degree to be approved by the court, and that it would place the extent of Popek’s co-operation before the court for whatever consideration the court deemed appropriate.
I will now deal with the relevant testimony of Popek at the trial and whether it truthfully conveyed to the court and jury the nature of his understanding with the prosecution. Again, it is necessary to quote his exact language. Popek testified as follows on cross-examination:
££ Q. Now, at any time before you made a statement to anyone in authority in connection with this case, were you led to believe or did you receive any information, that if you testified in this case, or named someone in this ease, you would be given a parole, or your freedom on probation would be hastened? A. I never was. ' ■ | ■'
££ Q. And you never even thought about it? A. No, sir.
££ Q. Is that right? A. That’s right.
*288 u Q. And you weren’t even interested in it? A. They iold me I would have to throw myself on the mercy of the Court.
“ Q. I am asking you, were you interested in it? Never mind what they told you. Were you even interested in it? A. No, I
was not. [Emphasis supplied.]
# * #
“ Q. You haven’t pleaded guilty yet in that case, have you? A. No. My trial didn’t come up yet.
“ Q. It was severed. You don’t know even if you are going to get a trial? A. I am going to get a trial.
“ Q. You are going to get a trial? A. Yes, I am.
* * *
“ Q. Not a promise has been made to you? A. You as a Dis-
trict Attorney, you never promised nobody anything.” (The cross-examiner had previously been an Assistant District
Attorney.)
And he testified as follows when questioned by the court, Wallace, J.:
‘ ‘ Q. And you are indicted for murder in the first degree for that crime, is that right? A. Yes, sir.
‘ ‘ Q. Has anything been said to you by anyone concerning the ultimate disposition of that murder charge against you? A. No. The District Attorney told me I would have to take a chance and throw myself upon the mercy of the Court.”
Popek’s answer of “ No ” to the court was a bald lie. Indeed, all of the foregoing testimony by Popek demonstrates a deliberate effort by him to fob off any inquiry into his understanding with the prosecution with the intent to conceal it from the court and jury. His statement that he would have to take a chance and throw himself on the mercy of the court is true to the extent that it was the function of the court to determine both whether Popek would be allowed to plead and if so, to what degree of homicide, as well as whether to grant Popek any consideration upon his sentence. But that was a half-truth, skillfully used to deflect attention from the really important truth—that the prosecution agreed to recommend a plea and, if accepted by the court, to call Popek’s co-operation to the attention of the court upon the sentence.
The People argue that Popek’s testimony was truthful when evaluated in the light of a layman’s understanding of legal terms. The court is unconvinced. The trial record and file and the record of Peller’s retrial, which the court examined, make it abundantly clear, as was indicated above, that Popek was no mere layman when it came to the jargon of criminal justice. In fact, on the Peller retrial, where he was asked even more *289 directly and persistently about any promises by the prosecution, he categorically denied that any were made. That testimony disposes of any doubt that he intended to lie at the original trial.
It is true that defense counsel argued at the trial, as the court noted in its charge, “that Popek is involved in this murder himself and wishes to escape the consequences of his act.” But petitioner was entitled to more than mere argument to the jury based upon inferences drawn from half-true and evasive testimony. He was entitled to full, unequivocal disclosure to the jury of any understanding between the witness and the prosecution. As the court pointed out in People v. Savvides (1 N Y 2d 554, 558, supra): “ It is true that in his interrogation the judge elicited some vague answers which might have induced the jury to believe that Mantzinos was ‘ hoping ’ for leniency, and in his charge he indicated his own belief that the witness entertained such a hope. But that is a far cry from positive knowledge that Mantzinos had actually been assured consideration in return for continued co-operation and that he had deliberately lied about the matter on the stand. Had the jury been apprised of the facts, it would have been in a better position to evaluate his veracity. In the first place, the conditional promise of consideration, the jurors could have concluded, furnished strong motivation for 1 co-operation ’ exceeding the bounds of truth. And, in the second place, even more significant because more revealing of the man, knowledge that Mantzinos had lied under oath might well have lowered the jurors’ assessment of his regard for the truth in general and, by that token, affected their appraisal of his other testimony incriminating defendant.”
I find that if the jury had had full knowledge of the understanding between Popek and the prosecution, its verdict may well have been different. The prosecutor’s duty, therefore, was to promptly expose Popek’s perjury either directly by his own statement or by further examination of Popek. His failure to do so deprived the petitioner of a fair trial and hence “ constitutes ‘ error so fundamental, so substantial, ’ that a verdict of guilt will not be permitted to stand. (People v. Creasy, 236 N. Y. 205, 221.) ” (People v. Savvides, supra, p. 557.) As the court stated further (pp. 557, 556):
“ That the district attorney’s silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.”
“ The administration of justice must not only be above reproach, it must also be beyond the suspicion of reproach.”
*290 The court’s sense of justice and fair play is offended by the facts and circumstances afore-mentioned. “ Perfection may not be demanded of law but the capacity to correct errors of inevitable frailty is the mark of a civilized legal mechanism:” (Felix Frankfurter Reminisces [New York, Reynal & Co., 1960], p. 203.)
The petitioner’s right to due process under the Constitutions of New York State and the United States (Napue v. Illinois, 360 U. S. 264) having been violated, the judgment of conviction is vacated and set aside.
The Clerk of the court is directed to prepare an order for the production of the petitioner as soon as practicable in Part I of this court for appropriate proceedings.