(November 1, 1990)

■ The People of the State of New York, Respondent, v Edwin Figueroa, Appellant.—Judgment, Supreme Court, New York County (Juanita Bing Newton, J.), rendered June 3, 1988, which convicted defendant, after jury trial, of two counts of criminal sale of a controlled substance in the third degree and sentenced him to two concurrent 6-to-12-year terms, reversed, as a matter of discretion in the interest of justice, and the case remanded for a new trial.

Police Officer Samuel Berkman was stationed on narcotics detail in an observation post located in a rear third-floor apartment of a building on East 106th Street on the afternoon of October 6, 1987. Using binoculars, he looked across a vacant lot and observed activity on East 105th Street between 1st and 2nd Avenues, looking for narcotics traffic. Berkman testified both before the Grand Jury and later at trial that at 3:35 P.M. he observed defendant hand Jose Santiago bundles of glassine envelopes. Defendant then walked towards 1st Avenue and disappeared from Berkman's view. Seven minutes later, he reappeared on the street and approached Carlos Vasquez and Genaro Cardona and handed them a bundle of glassine envelopes and walked away. Approximately 15 minutes later, defendant reappeared on the street, met Santiago, and gave him a bundle of glassine envelopes. While defendant remained on the street at this time, Berkman observed Cardona hand glassine envelopes to another man. Defendant again left, and reappeared a few minutes later and handed Vasquez and Santiago bundles of glassine envelopes.

Berkman then contacted the backup officers and told them to move in and arrest the men. Before the officers apprehended Vasquez and Santiago, Berkman saw them place the bundles of glassine envelopes on the ground near a parked

gold station wagon. Once the four men were arrested Berkman directed one of the arresting officers to the front of the station wagon, where he recovered two bundles of glassine envelopes from the ground between the front tire and the curb. Later testing demonstrated that the two bundles contained 9 and 10 glassine envelopes, respectively, each glassine envelope containing heroin.

The trial began on a Tuesday, and on that day, Berkman informed the Assistant District Attorney (ADA) that from his vantage he did not in fact see glassine envelopes in the bundles that he observed defendant and his cohorts pass back and forth, but that he had only seen white objects. The ADA informed the defense counsel of this revelation. Nevertheless, when Berkman testified he delivered the account described. When he was asked by both the prosecutor and the Trial Judge to particularize exactly what he observed, Berkman steadfastly stated that he saw glassine envelopes. He was specifically asked "Were you able to see that it was a glassine envelope" and he started to answer "From my experience" when the court interjected "Did you actually see the glassine envelopes, not what you thought was in them"; Berkman answered "Yes. I saw the glassine envelope that I described." On cross-examination, defense counsel also pressed this point, and even when asked if he had had a conversation with the ADA the day before when "you in fact told him that you couldn't see glassines", Berkman denied it. Then, on redirect examination, the ADA attempted to have Berkman clarify matters and asked him to recall the conversation they had. Berkman reaffirmed that "I was able to see bundles of glassine envelopes."

The issue was discussed throughout the day by the Trial Judge and counsel out of the presence of the jury. At the end of the day, the ADA informed the court that by the resumption of the trial two days later, on Friday, he would either decide on a stipulation or become a witness in the case regarding his conversation with Berkman. The defense counsel then stated: "[W]hen I asked for a stipulation regarding the conversation he had with this police officer * * * his response is he would try to clarify it through redirect and if he was not able to clarify it, there would be a stipulation. Now I hear that he is waffling on that as to what he is going to do. He told me when he walked in here this afternoon that yesterday the police officer told him he couldn't see glassines. We brought it to your attention, we had a discussion about it, we had several possible remedies. The District Attorney said

'Let me try to remedy it by redirect.' He couldn't and there is supposed to be a stipulation now."

The matter remained unresolved, and when the trial resumed on Friday, there was further colloquy between counsel and the court on how to proceed. Fearing that the ADA would rehabilitate Berkman if he were to be recalled as a witness, defense counsel objected to that procedure and the court agreed. Further discussion was put over until the following Monday, and the trial proceeded with other witnesses. On Monday, the court ruled that the ADA could not recall Berkman and directed the prosecutor to correct the record either by stipulation, by a statement to the jury or by testifying. The court chided the ADA and branded Officer Berkman "defiant" for his conduct, but eventually resolved the matter by reading the following stipulation to the jury: "Prior to Police Officer Berkman taking the stand Mr. Ippolito asked him to particularize what he saw the defendant give to other people and Police Officer Berkman stated that he saw a white object or white objects."

In summation, the ADA argued that Berkman testified that he observed what he believed to be bundles of glassine envelopes, and later argued that the jury should take into account the officer's expertise.

The court charged the jury that the stipulation "was accepted solely for the purpose of discrediting the witness Berkman's testimony at trial on the ground that at some other time he gave contradictory or inconsistent statements of versions of the facts".

The lengthy recitation of the circumstances of Officer Berkman's false testimony regarding his observation of glassine envelopes, and the well-meaning attempts to rectify the matter are set forth in detail to demonstrate the cumulative impact of this affair. By the continued recitation of his false testimony regarding the observation of glassine envelopes, the trial was irreparably tainted and defendant was denied his due process rights to a fair trial.

That this testimony had a prejudicial impact on the jury is an inescapable conclusion. It is well known to lay persons, as well as to law enforcement personnel, that a glassine envelope is a " 'telltale sign of heroin' " and the " 'hallmark' of a drug transaction". *(People v McRay,* 51 NY2d 594, 604, 605.) Berkman's continued repetition of the untrue statement that he had observed the defendant pass glassine envelopes reinforced the incriminating import of his reference. The brief and

ambiguous stipulation ultimately read to the jury cannot be said to have ameliorated the prejudicial impact of the prior testimony.

While the court commendably attempted to address this untoward situation, the prejudicial impact on the defendant remained. Fundamental fairness to the defendant required that the true facts be clearly and forcefully communicated to the jury to correct the false testimony. A conviction which is obtained based on evidence which is known to be false impairs a defendant's due process rights, requiring a reversal of that conviction (cf., People v Pelchat, 62 NY2d 97). The brief stipulation read to the jury did not fully and forcefully correct the testimony or convey to them the full impact of Berkman's admission that he was unable to see glassine envelopes and that his testimony in that regard was false. Since the conviction lies, at least in part, on Officer Berkman's reprehensible and false testimony, the error is so fundamental and substantial that the conviction should not be allowed to stand. (See, People v Creasy, 236 NY 205, 221; see also, People v Robertson, 12 NY2d 355.)

In basing our decision on the denial of a fair trial to the defendant, it is unnecessary to reach his claim that the Grand Jury proceedings were fatally tainted by Berkman's testimony before that body. We note, however, that at that time, there was no intimation that Berkman's testimony was false, and, significantly, there was other relevant evidence before the Grand Jury so that it cannot be said that the indictment rested solely on false evidence. (Cf., People v Pelchat, supra.) Concur—Murphy, P. J., Carro, Asch and Ellerin, JJ.

Smith, J., dissents in a memorandum as follows: I would affirm the conviction. The stipulation, the defense counsel's extensive references to Police Officer Berkman's apparent misrepresentation in her summation and the court's charge addressed any potential injury to the defendant caused by Berkman's testimony. Moreover, as the majority concludes, the Grand Jury evidence was legally sufficient. (People v Pelchat, 62 NY2d 97 [1984].)

The People's chief witness, Officer Berkman, testified both before the Grand Jury and at trial that he observed the defendant transfer bundles of glassine envelopes. Following his Grand Jury testimony and one day prior to testifying at trial, Officer Berkman apparently advised the Assistant District Attorney that he had seen the defendant pass white objects which Berkman concluded were glassine envelopes.

At trial, despite questioning by the Trial Assistant intended to elicit a response from Berkman that he saw white objects, the officer maintained that he observed glassine packets. The majority concludes that Berkman's continued recitation of this "false testimony" (at 104) denied the defendant a fair trial. I disagree with the majority's characterization of the statement and that its repetition denied the defendant a fair trial.

On direct examination the Assistant District Attorney sought to elicit what Berkman observed, asking: "Were you able to see that it was a glassine envelope?" Berkman began to respond by referring to his experience and training. The Trial Judge interrupted and asked Berkman if he actually saw glassine. Berkman responded, "Yes, I saw the glassine envelope that I described."

At the close of Berkman's direct examination, the prosecutor advised the defense attorney of the apparent discrepancy with the officer's prior statement. Thus, Berkman was questioned upon cross-examination as to his earlier conversation with the prosecutor. The defense attorney specifically asked:

"Q. * * * you have just indicated or just told us today that you did see glassines, is that right?

"A. I saw bundles. * * *

"Q. Officer, you had a conversation with [the Assistant District Attorney] yesterday, didn't you?

"A. Yes.

"Q. And at the time that you had a conversation with [the Assistant District Attorney] you in fact told him that you couldn't see glassines, isn't that true?

"A. I don't recall that.

"Q. You don't recall that?

"A. No, ma'am."

Thereupon, at a bench conference, defense counsel requested a stipulation regarding the conversation, and the prosecutor stated that he would try to clarify the inconsistency upon redirect. This issue was addressed upon redirect examination as follows:

"Q. Now, do you recall having a conversation with me yesterday regarding what you were able to see while looking through your binoculars?

"A. I recall having a conversation with you, yes. * * *

"Q. Do you recall whether or not we discussed the differences between what you saw and were able to describe physi-

cally and what you might have concluded on the basis of your training and experience that those objects that you saw were?

"A. Yes.

"Q. Bearing in mind that conversation when you looked through the binoculars what were you able to see, not bringing into the picture your training and experience?

"A. While looking through the binoculars I was able to see bundles of glassine envelopes."

Thereafter, the trial court presented the Trial Assistant with the option of either stipulating or testifying as to the prior conversation. Ultimately, the court read to the jury the following stipulation: "Prior to Police Officer Berkman taking the stand [the prosecutor] asked him to particularize what he saw the defendant give to other people and Police Officer Berkman stated that he saw a white object or white objects."

Berkman's alleged misrepresentation featured prominently in the defense summation. Defense counsel began her summation by referring to Police Officer Berkman's testimony and to the stipulation as the "crux" of the case. She went on to state:

"Police Officer Berkman sat on that witness stand after taking the oath in the presence of all of you * * * and he lied to you. I asked him specifically 'Did you have a conversation with this district attorney about this very issue and did you say what object [you observed]?' and he looked up at me and he said, 'No'.

"You had another opportunity to view how this witness responded to that question because [the Assistant District Attorney] right after that looked up and said, 'Didn't we have a conversation and didn't you tell me something?' 'No.' Ladies and gentlemen, you saw a lie taking place. I'm not talking about something that may have happened or might have happened, you sat here and you all viewed it. That experience coupled with this stipulation is persuasive in this trial."

Throughout her summation defense counsel made repeated references to the "flagrant discrepancies" in and "flagrant unreliability" of Berkman's testimony. She concluded her summation by referring to the stipulation and by imploring the jury not to convict upon the testimony of someone "who just lied in court."

In its charge, the court properly advised the jury as to the weight to be given misrepresentation of a material fact and as to the significance of the stipulation:

"if in your deliberations you find that a witness has lied or was mistaken with respect to a material fact you are at

perfect liberty to disregard that witness' entire testimony or you may disregard so much of his testimony as you believe to have been untruthfully or inaccurately given and accept that portion which you find to have been truthfully and accurately given.

"A stipulation by the attorneys was entered into in this case. A stipulation by the attorneys means that there is no dispute as to the facts contained in the stipulation. Indeed stipulations are conclusive of the facts admitted within the stipulation. * * *

"There was one stipulation in this case and it was accepted solely for the purpose of discrediting the witness Berkman's testimony at trial on the ground that at some other time he gave contradictory or inconsistent statements or version of the facts."

The alleged misrepresentation was clearly placed before the jurors who had an opportunity to give it as much or as little weight as they deemed appropriate.

The defendant's contention that the integrity of the Grand Jury proceedings was impaired by Officer Berkman's misleading testimony similarly should be rejected as the majority concludes. At the time of the Grand Jury presentation the Assistant District Attorney had no knowledge of the alleged misrepresentation and, thus, it cannot be said that the Assistant knowingly allowed prosecution of an indictment based upon false evidence. *(People v Pelchat,* 62 NY2d 97, 105, 107, *supra; People v Alexander,* 136 AD2d 332, 336 [1st Dept 1988].) Moreover, the officer's lack of candor, if any, would not have tainted the entire Grand Jury presentation since other evidence was presented to the Grand Jury supporting the indictment. Testimony was presented that bundles of glassine envelopes containing narcotics were found in the location described by Berkman moments after they were discarded by the codefendants. The alleged discrepancy in Berkman's testimony, at most, would have created a question as to the strength of the evidence. *(See, People v Goetz,* 68 NY2d 96, 116-117 [1986].) The indictment did not rest upon a sharp distinction between what the police officer apparently saw and what he purports to have seen, since the inference that the white objects were drugs was inescapable. As the trial court observed in its decision denying defendant's motion to dismiss the indictment, the officer's testimony was "given in a conclusory fashion."

Further, there is no merit to the defendant's claim that he was denied a fair trial because at trial he was not provided with a police department medical treatment form which the

People maintained had been lost. Moreover, the court did not abuse its discretion in addressing the absence of this document. *(People v Martinez,* 71 NY2d 937, 940 [1988].) Significantly, there was no prejudice to the defendant who produced two witnesses contradicting police testimony that the defendant did not limp at the time of the crime. *(People v Martinez,* 71 NY2d, *supra,* at 940; *People v Kelly,* 62 NY2d 516, 520 [1984].)* The defense was also provided with a blank copy of the missing form, the precinct desk log and the defendant's postarrest medical record.