CHARLES KEEFE, Defendant in Error, *vs.* ARMOUR & Co., Plaintiff in Error.

*Opinion filed February 20, 1913—Rehearing denied April 2, 1913.*

1. EVIDENCE—*it is improper to allow expert to give opinion as to an ultimate fact.* The right of trial by jury entitles every party to the judgment of the jury as to the ultimate fact upon which liability rests, and it is error to permit an expert witness to give an opinion on such ultimate fact.

2. SAME—*when testimony of expert witness is improper.* Where the ultimate fact in issue in a personal injury case is whether the method which the defendant's foreman directed the plaintiff to use in testing a tank car for leaks was reasonably safe, it is proper to permit the plaintiff to prove, by properly qualified experts, what conditions might arise from the use of such method with reference to gases, heat, etc., but it is error to allow an expert witness to state that in his opinion the method employed was unsafe.

3. SAME—*when opinion of alleged expert is a mere guess.* In an action for an injury to a boilermaker by the blowing out of the end of a tank which he was testing for leaks by air pressure, testimony by a physician, who admitted that he had never had anything to do with explosions of gas or any experience with such explosions, that there must have been a spark which caused gases in the tank to explode, is not an expert opinion but is a mere guess by one who knew nothing about the subject.

4. INSTRUCTIONS—*when giving instruction as to master's duty as to place of work is error.* The master's duty to use reasonable care to provide his servant a reasonably safe place to work has reference to nothing except keeping the premises physically safe, and it is error to give an instruction stating such doctrine in a suit for an injury to a boilermaker from the blowing out of the end of a tank he was testing for leaks, there being no claim in the pleadings nor any proof that there was anything unsafe about the premises where he worked.

WRIT OF ERROR to the Branch "B" Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. BEN M. SMITH, Judge, presiding.

A. R. URION, and A. F. REICHMANN, for plaintiff in error.

C. HELMER JOHNSON, and DANIEL BELASCO, for defendant in error.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

The Appellate Court for the First District affirmed a judgment recovered by Charles Keefe, defendant in error, in the superior court of Cook county, against Armour & Co., plaintiff in error, for damages on account of injuries suffered by the bursting of a tank which he was repairing as a boilermaker in the employ of the plaintiff in error. The record is in this court in pursuance of a writ of *certiorari* granted for that purpose.

There was no serious dispute as to the following facts: The plaintiff had been a boilermaker for twelve years, and during seven or eight years of that time had been in the employ of Swift & Co. in a business similar to that of the defendant. At the time of the accident he was in the employ of the defendant, and the foreman told him that there was a tank car standing out on the track which had lost about four hundred or five hundred pounds of grease the last time it was filled; that plaintiff should go out and find out where the leaks were and calk them, and that he should get a hose for testing the tank, connect it up and put the air pressure on, and get a can of soap suds to swab the seams and find out where the leaks were. The foreman did not give any direction as to the amount of air pressure or any other order than as stated. The plaintiff found the

car and it was marked in bad order. He got the hose at the tool room and connected it with the tank and told his helper to turn the air on slowly. He watched the gauge until the pressure was up to thirty-eight pounds to the square inch, when he told the helper to shut off all but enough to hold the pressure there while he examined the tank.. The helper got the soap suds, which were used to swab the seams so that bubbles would show where there was a leak. The seams were swabbed and the rivets were tested with a hammer. The foreman came along and took the hammer and went over the rivets and asked the plaintiff how many pounds pressure he had, and was told that the pressure was thirty-eight. The foreman said, "All right; go ahead and calk it." The plaintiff had a hammer and calking iron and thought that he tapped the tank, although he was not certain and had previously testified that he thought he did not. The head blew out of the tank and caused the injuries. The tank was about fifteen years old and did not appear externally to have any defect, and the ordinary life of a tank was longer than that period. The inside of the tank was coated with grease and stearin, and it had the usual disagreeable smell of oil and grease and was ordinary soap stock. The plaintiff was a competent boilermaker, and the kind of work he was directed to do was included in that trade or occupation. He testified that he knew how to make repairs and asked for no direction and received none, except to get the hose, put the air pressure on, find the leaks and make the repairs.

The case was tried on the second and third counts of the original declaration and the second and third additional counts. The ground of liability alleged in the second original count was negligence in failing to inspect the tank and in negligently permitting air to be pumped into it beyond its strength to withstand the pressure. The third averred negligence in filling the tank with air to a high pressure while it was not reasonably strong enough to hold the air

at that pressure. A year after the declaration was filed the additional counts were filed, introducing the question of gases in the tank. The second additional count averred negligence in placing air in the tank and causing it to be mixed with gases therein, and the third charged that the defendant negligently ordered the plaintiff to use the calking tool while the tank was in a dangerous and unsafe condition and likely to explode from gases.

The principal controversy at the trial concerning matters of fact was whether the introduction of air and raising the pressure to thirty-eight pounds generated gases in the tank which, mingled with the air, were explosive, and whether there was an explosion of such gases in some way from igniting them by a spark from the calking tool or from heat caused by the pressure. The plaintiff claimed that gas was formed and exploded and that testing the tank by air was not a reasonably safe method, and charged the defendant with liability because the foreman told him to get the hose and use air, and when the foreman came to the car afterward he knew that the plaintiff had a pressure of thirty-eight pounds in the tank. The defendant, on the other hand, contended that testing by air was one of the usual and customary ways for testing tanks for leaks and was a safe method; that gases did not form and could not have formed in the tank, and it exploded merely because of the pressure applied; that the plaintiff knew more about the condition of the tank than the defendant or its foreman and was sent to it for the very purpose of ascertaining its condition and making repairs, and plaintiff being a boiler-maker of twelve years' experience, who knew how to test and repair tanks and asked for no information or instruction as to the method of doing the work, the defendant had a right to assume that he knew the proper methods and the dangers involved, and therefore he assumed the risk.

The evidence was that there were three methods of making tests of tanks, which were by air, water or steam.

The plaintiff testified that they tested tank cars at Swift's by filling them with water and then putting on sixty pounds of air pressure, and a witness for the defendant testified that such hyraulic tests were used for new work, to test the whole efficiency of the tank car for the purpose for which it was made. The plaintiff's helper and another witness testified, on cross-examination, that air was one of the customary and usual ways of testing tanks, and a witness called as an expert said he understood that testing tanks by air for leaks had been a method in common use. There was testimony by other witnesses for the plaintiff that testing tanks by air was not a safe and proper way and that the test should be by water, while witnesses for the defendant testified that the use of air was proper and was the customary and usual method employed. There was evidence for plaintiff that gases from grease would form under air pressure and the heat generated thereby, which would be explosive, and witnesses attributed the explosion to the formation of such gas. Witnesses for the defendant testified that gas could not have come from the grease; that it would require a temperature of from 400 to 450 degrees Fahrenheit before any gas would be given off; that the flashing point of yellow grease or stearin was the above temperature, and that it was not possible to ignite gas below the flashing point, because until that point was reached there could be no gas. The plaintiff testified that the tank was hot so that he could not hold his hand on it very long, and the evidence for the defendant was that it would have to be hot enough to burn and blister a hand instantly in order to form any gas; that there was no connection between tapping the tank and any sparks or heat, and no condition inside of the tank which could possibly have generated explosive or combustible gas.

The plaintiff called a witness who was chief inspector of steam boilers and steam heating and cooling plants in Chicago and had held the position for three years. That

was the only qualification as an expert which was shown in connection with the fact that he had seen grease burn in a frying pan with a thick, black smoke. He was the same witness above referred to who said that he understood that testing for leaks by means of compressed air was one of the ordinary and usual methods. He testified that he had an opinion that the explosion was a gas explosion, and in answer to a hypothetical question including the methods adopted in this case and calling for his opinion, he was permitted to testify that the method adopted was not reasonably safe. This witness did not qualify as an expert concerning gases, or whether they would form, or under what conditions, and any one of the jury was as well qualified as he to determine whether the explosion was a gas explosion or not. The question whether the method employed was reasonably safe was an ultimate fact in the case, to be determined by the jury as a conclusion from evidentiary facts. To permit the witness to give his opinion on the ultimate fact was to supplant the jury by a witness, and practically take from the defendant the right to a judgment of the jury as to the proper inferences to be drawn from the facts. Of course, the jury was entitled to the aid of experts in determining the existence or non-existence of facts not within the common knowledge from which a conclusion would arise whether the method was reasonably safe. It was competent to prove that the conditions stated in the hypothetical question would be liable to form gases; that such gases would be explosive and would explode by ignition or at a certain temperature, as well as any other fact which would enable the jury to draw an inference as to the ultimate fact to be determined, but it is the rule of this court that an expert witness must not take the place of the jury and declare his belief as to the ultimate fact. (*Chicago and Alton Railroad Co.* v. *Springfield and Northwestern Railroad Co.* 67 Ill. 142; *Pyle* v. *Pyle,* 158 id. 289; *Illinois Central Railroad Co.* v. *Smith,* 208 id. 608;

258 – 3

*Yarber* v. *Chicago and Alton Railway Co.* 235 id. 589.) The right of trial by jury entitles every party to the judgment of the jury as to the ultimate fact upon which liability rests. The plaintiff called a witness who was a chemist of fifty years' experience and an expert, and propounded to him a hypothetical question including the fact that there was an explosion of the tank and called for his opinion as to the cause of the explosion. The witness answered that the condition described indicated the possibility of an explosion, but the witness could not say what kind of an explosion it was because the kind of explosion depended upon what did explode. Another witness who was a physician, surgeon and oculist, who said he had never had anything to do with explosions of gas or any experience with such an explosion, was permitted to give an opinion that there must have been a spark that caused gases in the tank to ignite, which was nothing but a guess by one who knew nothing about the subject.

The charges of the declaration have already been stated, and they did not include any charge respecting a safe place to work or any breach of duty in that regard, and there was no evidence to sustain such a charge if it had been made. The court gave to the jury, at the request of the plaintiff, the following instruction:

"The court instructs the jury that it is the duty of the master to exercise reasonable care to furnish the servant with a reasonably safe place to work, and that this is a non-delegable duty, and cannot be assigned to a servant so that the master may escape liability on the ground of fellow-servantship. It is the duty of the master to exercise reasonable care to discharge that duty, whether he undertakes to perform that duty personally or through a servant."

The rule stated was correct, but it relates to the condition of premises, buildings and things which properly constitute a place for work. The rule is illustrated by various cases, such as *Illinois Steel Co.* v. *Schymanowski,* 162 Ill.

447, where a servant was required to work next to a dangerous pile of ore; *Iroquois Furnace Co.* v. *McCrea,* 191 Ill. 340, where a part of a dump pile had been removed so as to leave a perpendicular wall, making it dangerous for a servant to walk over it in the night time; *Western Stone Co.* v. *Muscial,* 196 Ill. 382, where the servant was required to load dirt into a wheelbarrow next to a perpendicular wall which was dangerous; *Libby, McNeill & Libby* v. *Banks,* 209 Ill. 109, where the defendant maintained a platform which made the place for the performance of the servant's duty dangerous; and *Acme Harvester Co.* v. *Chittick,* 230 Ill. 558, where there was a slippery hard-maple floor upon which the servant was required to stand. The duty includes the element of locality, and has no reference to anything except the keeping of the premises physically safe, (*Nordhaus* v. *Vandalia Railroad Co.* 242 Ill. 166,) and the rule could not possibly be applied to the facts of this case. There was an instruction on the question of assumed risk, which is criticised as excluding ordinary risks incident to the employment, but while the exceptions are not clearly stated we cannot say that it would mislead the jury. The case was one where the facts were contested and where the evidence was not such as necessarily to lead to but one conclusion. The jury might very well have applied to the case the instruction concerning a reasonably safe place to work and considered that there was a breach of that duty, and the verdict is as readily referable to that instruction as to any other statement of the law made by the court. The jury may also have accepted the judgment of the chief inspector that the method used was not reasonably safe, and that the defendant was liable because the foreman told the plaintiff to use air, instead of deciding that question from the facts proved.

The judgments of the Appellate Court and the superior court are reversed and the cause is remanded to the superior court.

*Reversed and remanded.*