CLYDE E. PAYNE, Plaintiff and Counter-Defendant, Appellee, *v.* HAROLD NOLES *et al.*, Defendants and Counter-Plaintiffs, Appellants.

(No. 71-178;

Second District—May 19, 1972.

Fearer & Nye and Donald A. Manzullo, both of Oregon, and John Olivero, of Peru, all for appellants.

Gilbert & Powers, of Rockford, for appellee.

Mr. JUSTICE GUILD delivered the opinion of the court:

This appeal arises from a suit concerning collision of an automobile and a motorcycle at a hilly curve on Daysville Road, Ogle County, on June 9, 1968. Clyde Payne, driver of the automobile, brought suit for property damage to his vehicle against Harold Noles, operator of the motorcycle, and Robert Duke, a passenger on the cycle. Noles and Duke counterclaimed for resulting personal injuries.

At the close of the case for Payne (auto driver), the trial judge directed a verdict for Duke (cycle passenger), relieving Duke of liability for any damages to Payne's automobile. The jury returned verdicts in favor of Payne (auto driver) against Noles (cycle operator) for damages to the automobile in the amount of $578.73, and against both cyclists on their counterclaims for personal injuries.

The cyclists, Noles and Duke, ask reversal of judgments entered on the

jury verdict, claiming error in the trial court's allowing an expert witness to testify for Payne, the auto driver, and allowing Payne to testify concerning the age of his child and the pregnancy of his wife, passengers in his automobile at the time of the collision. Appellant Noles raises an additional issue that the trial court erred in instructing the jury that a specific amount of damages must be granted if they found for Payne.

A centrally disputed fact in this case was whether the accident occurred in the northbound lane, in which Payne's car was proceeding, and as Payne and his wife testified, or whether it occurred in the cycle's proper lane, southbound, as Noles and Duke testified.

Payne said he crested a hill traveling 35 to 40 mph, and first saw the motorcycle in its own lane about six inches from the center line, traveling about 70 mph. Payne said he saw the cycle driver sitting straight up and the passenger leaning to the right, that the wheels of the cycle were "straight and wobbling" at the same time, that the cycle came into his lane and struck the left front fender, wheel and tire of his 1965 Plymouth automobile. Before the collision, Payne said, he swerved his car to the right and slammed on his brakes, that it skidded "a little bit" toward the cycle, went down the road and turned around with the back end going north. There was debris in both lanes. Mrs. Payne testified that immediately prior to impact Duke was leaning and the cycle operator (Noles) had thrown his hands into the air.

Duke testified that the cycle on which he was riding as a passenger was traveling about 45 to 50 mph, that he leaned with the cycle as it came up the hill and around the curve, that he saw Payne's car more than halfway on the wrong side of the road traveling about 70 mph and next remembered waking in a hospital five or six days later. Noles testified he was going 45 to 50 miles an hour just prior to the curve, that he was in the middle of his own lane of traffic when the car suddenly came down the crest of the hill at a high rate of speed right at him, and he was unable to do anything to avoid the collision. He testified his passenger leaned with him and his tire never wobbled. Both Duke and Noles suffered extensive left leg injuries.

An investigating officer testified to finding a gouge mark on the pavement approximately two feet east of the center line in the northbound lane which could have been caused by bent metal on the car or by the cycle, and in response to a question by Noles' attorney on cross examination, said he had determined from his investigation that the gouge mark was at the point of impact. The southbound lane was stained with gas and oil; debris and glass were all over the area; and he had not closely examined other gouge marks on the pavement which did not appear fresh. The persons involved in the accident had been removed when the

officer arrived at the scene, but he later talked with Payne who said it did not look as if the cycle was traveling at a high rate of speed, which was contrary to his testimony at the trial, but that it looked as if the front wheel was wobbling or its driver did not have control of it. Payne told the officer he had tried to avoid the cycle but it all happened too fast; he hit his brakes, and they were on top of him.

Joseph Harris. a physicist, was called by Payne as an expert witness. After stating his education, experience, and technical society affiliations, he stated he had been employed by General Motors for twelve years as a senior physicist primarily engaged in automotive and traffic safety and was now a private consultant. He was called by Payne as an expert witness for the stated purpose of explaining the principles of gravity, balance and stability of motorcycles over the objection that eye-witnesses precluded the use of a reconstructionist and that the area of expertise was not beyond the ken of knowledge of the jurors. (Harris subsequently testified that the principles of motorcycle stability and leaning of passengers are the same as for a bicycle.) The trial court allowed Harris to testify as long as there was "no reconstruction of the accident", and in the course of his testimony, Noles and Duke further objected that the foundation for his opinion was improper, contending that the piecemeal hypothetical questions were deficient in evidentiary facts.

The motorcycle involved was a 1968 Kawasaki. Harris said he did not know where the center of gravity was on the Kawasaki motorcycle, but assumed a "well-designed", empty motorcycle, and demonstrated on a diagram that the center of gravity was "some place down in here, or some place up in here", depending on the exact machine. He was asked to assume that a driver weighing 150 to 160 lbs. was placed on the machine, and he demonstrated that the center of gravity is "up here some place" and said the center of gravity of the vehicle was higher because of the added weight, with very, very few exceptions. Adding a passenger of "average weight" to the rear of the driver he said, would shift the center of gravity up again and back, demonstrating on a blackboard that "in fact it will end up with a new point in here." The major effect of this change in gravity, he said, came in turning a corner. Harris was asked to assume the curve shown in a photograph, a vehicle driving out of the photograph from north to south, and to describe the effect, if any, the change in gravity from C to Y in his diagram would have on the stability and balance of a vehicle taking that curve. He responded that if a motorcycle were carrying two persons, its center of gravity would move considerably higher and centrifugal force would cause the center of gravity to move to the left and force the wheel out of the way. He described the effect of leaning generally, and the effect particularly of

the passenger's leaning to the right and the driver's remaining upright, concluding that he would expect to see the front of the vehicle wobble. There was no evidence of the weight of Noles or Duke, the topography, grade, composition or condition of the curving road, nor of any personal observation by the witness of the site or the motorcycle involved in the collision.

Whether the trial court erred in admitting testimony of expert witness Harris is discussed by the litigants in terms of whether he provided abstract, academic information on scientific principles which contributed relevantly to the understanding of the jury in arriving at a correct verdict, or whether he was a particular kind of expert witness, that is, an accident reconstructionist, whose testimony was unnecessary and without probative value.

■■ Payne's counsel supports his claim to an academic discussion of stability by suggesting in oral argument that the opinion of witness Harris was not based on any physical facts of the accident nor on the particular motorcycle involved. We consider this a flaw rather than a virtue, as one test of admissibility of this kind of evidence is whether there is sufficient, undisputed physical evidence, stated in a hypothetical question, to provide the basic data needed for the application of scientific principles. Lacking such a foundation, the expert's opinion is as much speculation, guesswork and conjecture as would be a jury's verdict based on the absence of basic and necessary facts. (*Abramson v. Levinson* (1969), 112 Ill.App.2d 42 at 47 and 50, 250 N.E.2d 796.) The objection of Noles and Duke at trial to an improper foundation was well taken.

■■■ Expert opinion evidence is subject to the same test of relevancy as any other kind of evidence, and here, the only relevancy we perceive in the testimony of Harris is a pervasive inference that the collision occurred in the northbound lane, a corroboration of the Paynes' testimony that the cycle operator was upright, the passenger leaning, and the front end wobbling, and an impeachment of the testimony of Noles and Duke that they leaned into the curve, the cycle did not wobble and the car came down upon them in their own southbound lane. So viewed, its admission was error clearly requiring reversal.

■■■ We arrive at this result, not because the availability of eyewitnesses precluded the use of expert testimony, but because such testimony is to be rejected unless it is necessary to aid the jury in arriving at a correct and just result. While there may often be an understandable correlation between the necessity for expert opinion and the absence or unavailability of eyewitnesses, the test of admissibility should not be obscured. As stated by the Supreme Court in *Plank v. Holman* (1970), 46 Ill.2d 465 at 470, 264 N.E.2d 12:

"* * * reconstruction testimony may not be used as a substitute for eyewitness testimony where such is available. Whether it may be used in addition to eyewitness testimony is determined by whether it is necessary to rely on knowledge and application of principles of science beyond the ken of the average juror."

It should be the exception rather than the rule, has no place if the determinative facts are otherwise established by credible, physical or eyewitness evidence, and cannot be used to impeach otherwise credible eyewitness testimony. (*Siltman v. Reeves* (1971), 269 N.E.2d 728, 730.) To the same effect, *McGrath v. Rohde* (1971), 265 N.E.2d 511. As the jury had before it the testimony of four eyewitnesses concerning the lane in which the collision occurred and an investigating officer concerning physical evidence left upon the highway, there was no necessity for the jury to consider expert opinion. The admission of this type of testimony by the expert witness constituted reversible error requiring a new trial.

■■■ The second claim of error relates to testimony of Payne's family circumstances. He testified that his wife and little girl were with him in his automobile. Then over objection, his attorney asked the age of his little girl and the condition of his wife, receiving the responses that his child was three years of age and his wife was six months pregnant. The trial court allowed the answer on the basis it showed that under the circumstances Payne would not be traveling at a high rate of speed. As we have already determined that the judgment herein must be reversed, it is unnecessary to decide whether this testimony standing alone would constitute reversible error, but eliciting the age of his child and the pregnancy of his wife was clearly error and such testimony must be excluded in a new trial. In some instances, which did not exist in this case, such testimony is admissible; but the rule is, that lacking some unique circumstance which renders such evidence admissible, domestic affairs of the parties are irrelevant and often prejudicial in a suit to recover compensatory damages for personal injuries. *McCarthy v. Spring Valley Coal Co.* (1908), 232 Ill. 473, 479, 83 N.E. 957; *Brayfield v. Johnson,* 62 Ill.App.2d 59, 64, 210 N.E.2d 28; *Hedge v. Midwest Contractors Equipment Co.* (1964), 53 Ill.App.2d 365, 202 N.E.2d 869; *Falcon v. La Roche* (1955), 4 Ill.App.2d 112, 123 N.E.2d 587.

■■■ A determination of the jury instruction issue raised by Noles is likewise unnecessary to our decision. He complains that the trial judge indicated the dollar amount of damages in the verdict form, if the verdict favored Payne's claim for property damage to the automobile. No indication of amount was made on the verdict forms of the counterclaimants for their respective personal injuries. The amount of the car damage was not in dispute, but rather the complaint is that the approach among

the parties was uneven and may have misled the jury. It is a practice, used in some trial courts, to insert the amount of damages in the verdict form where the plaintiff is entitled to the whole amount of his damages, or none at all if the issues are found for the defendant. There appears to be no authority either for or against this practice in Illinois. The difficulty arises, as here, where the amount of one party's damages are inserted in the verdict form, and no amount is inserted in the verdict form for the crosscomplainant. In such an instance the amount of damages should not be inserted for either party as the inference may well be to the jury that the court favors one party over the other on the question of liability and subsequent damages to be awarded. The situation here appears to have resulted inadvertently in part from the circumstance that the conference on instructions was held prior to the time a verdict was directed for Duke, and this situation should not recur in the course of a new trial.

Reversed and remanded.

SEIDENFELD, P. J., and ABRAHAMSON, J., concur.