SHERYL ROSE AUGENSTEIN, a Minor, by Rebecca Augenstein, her Mother and Next Friend, Plaintiff-Appellee, v. JAMES PULLEY, Defendant (Floyd Steinmetz, Defendant-Appellant).—PAT SAMPLES, Special Adm'r of the Estate of Gilbert Lee Allen, Deceased, Plaintiff-Appellee, v. JAMES PULLEY, Defendant (Floyd Steinmetz, Defendant-Appellant).— FLOYD EDWARD STEINMETZ, Plaintiff and Counterdefendant-Appellant, v. JAMES STEVEN PULLEY et al., Defendants and Counterplaintiffs-Appellees (Floyd Edward Steinmetz, as Father and Next Friend of Matthew Steinmetz, et al., Plaintiffs).

Fifth District No. 5—88—0255

Opinion filed December 14, 1989.

Charles E. Schmidt, of Mitchell, Brandon & Schmidt, of Carbondale, for appellant.

Donald V. Ferrell, of Jelliffe, Ferrell & Morris, of Harrisburg, for appellee James Pulley.

Paul Thomas Austin, of Paul Thomas Austin & Associates, of Marion, for appellee Pat Samples.

JUSTICE CHAPMAN delivered the opinion of the court:

This case is a consolidation of three separate cases arising from an auto accident involving two vehicles that occurred August 30, 1985. On that date Floyd Steinmetz drove his white Ford LTD sedan to Marion, Illinois, with his two sons to pick up a pizza. Steinmetz picked up the pizza and was traveling back home south on Route 37 when the collision occurred.

The driver of the other vehicle, 16-year-old James Pulley, had received his driver's license just two weeks earlier. James Pulley borrowed his parents' red Ford Escort, and he and Gilbert Lee Allen were picking up their dates for the evening. They drove first to Sheryl Augenstein's home, south of Marion off Route 37. Sheryl joined James and Gilbert, and then the three of them traveled north on Route 37, intending to pick up another young lady. The collision occurred while they were on their way to Marion, Illinois.

Route 37 is a two-lane paved road. As one approaches the scene of the accident traveling southbound, the direction Steinmetz was traveling, the road curves gently to the left. Just north of the curve there is a slight crest of a hill. At the curve the road dips slightly. The posted speed limit is 55 miles per hour. It is undisputed that both vehicles were traveling at lawful speeds and that the impact occurred about four-tenths of a mile north of the curve. The testimony, however, was in conflict as to just how the accident happened.

As a result of the head-on collision between the two vehicles Gilbert Lee Allen was killed. Sheryl Augenstein and James Pulley sustained personal injuries. The cars sustained property damage. Floyd Steinmetz and his two sons, Matthew and Joey, suffered personal injuries. Each of the parties filed separate claims against the respective drivers in three separate lawsuits, which were consolidated for trial.

The jury returned a verdict for all plaintiffs and found both defendants negligent. The jury next considered the issues of contributory negligence and contribution, and found that both drivers were each 50% at fault. Floyd Steinmetz filed this appeal.

The main issue at trial concerned which of the vehicles was in the proper lane of traffic just prior to the accident. Because of this dispute testimony regarding the location of the pizza box in the Steinmetz vehicle at the time of the accident was significant. Counsel for James Pulley presented evidence that the pizza was in the front of the car, implying that it fell and that when Floyd Steinmetz attempted to retrieve it his vehicle veered into the oncoming lane of traffic.

Errors on appeal are urged with regard to the reconstruction evidence presented at trial and the disallowance of certain testimony directly impacting upon the credibility of a witness who testified as to the location of the pizza. The errors urged can be divided into four groups: (1) the court's barring Steinmetz' counsel from describing evidence in opening statement and during closing argument regarding the credibility of William Campbell; (2) the court's ruling on an alleged judicial admission by Pat Samples' counsel; (3) the court's allowing Dr. Orthwein to testify as to the point of impact of the vehicles and the court's considering Dr. Orthwein's testimony in ruling on the motions for directed verdict; and (4) the court's instructing the jury that they had to find Floyd Steinmetz at least 1% at fault during the contribution phase of its deliberations. Floyd Steinmetz contends that the cumulative effect of these errors requires reversal of the judgment of the trial court. In the alternative, Floyd Steinmetz argues that the trial errors denied him a fair trial, and he asks that the cause be reversed for a new trial.

On the day of the accident Floyd Steinmetz was traveling with his sons Matthew, age 12, and Joey, an infant. All three were riding in the front seat of the car. Matthew testified at trial that his father put the pizza in the back seat of the car before driving home. Matthew stated that he saw the other car prior to the accident and that it was in his father's lane.

Floyd Steinmetz testified that after picking up the pizza in Marion, Illinois, he placed it on the back floorboard behind the driver's seat. On cross-examination, a portion of the Steinmetz deposition was read and Floyd Steinmetz acknowledged that the testimony therein was true. A question posed at the deposition was whether it was possible that one of Floyd Steinmetz' boys was holding the pizza while they drove. Mr. Steinmetz replied, "could be. My boy Matthew might have been holding it, but usually we put it in back."

Floyd Steinmetz testified that it started misting rain as he and his boys headed home after getting the pizza. He testified that he had his windshield wipers and his headlights on. He stated that as he reached the peak in the road on Route 37, just north of where the collision occurred, car lights appeared from nowhere. When he noticed the lights, the other car was in his lane. He tried to turn the steering wheel, but the cars hit and the wheel was jerked out of his hand.

James Pulley testified that he recalled turning on his windshield wipers as he turned onto Route 37. He testified that that was the last thing he remembers prior to the accident. State troopers Roger Walker and Dennis Tregoning testified that they spoke with James Pulley about one hour after the accident. Officer Walker declared that James did not say that he had veered into the oncoming lane of traffic prior to the accident, but that he did tell him that he was reaching to turn on the wipers and at some point the accident occurred. Officer Walker also spoke with Floyd Steinmetz after the accident. Mr. Steinmetz told Officer Walker that as he looked up, he saw a car coming over into his lane of traffic, and that he simultaneously attempted to pull to the right to get out of the way.

Floyd Steinmetz' statement of what happened just prior to the collision was supported by post-occurrence witnesses. Franklin Lokerse testified that his house is located east of Route 37 adjacent to where the accident occurred. He was in his driveway some 150 feet away when he heard the vehicles collide. He immediately rushed to the scene, and upon approaching Steinmetz' car, Lokerse testified that Mr. Steinmetz made the statement: "I couldn't get away from him."

Imogene Benton, another post-occurrence witness who came upon the accident scene, testified that she approached the Steinmetz car and that its driver kept saying: "I tried to get out of his way, moved over, tried to get out of his way, and he just kept coming."

In support of Floyd Steinmetz' theory that the pizza was not in the front seat, and was not a link in the causal chain, his sister took the witness stand. She testified that she viewed the two automobiles the day after the accident and observed the pizza box on the floorboard behind the driver's seat. Contrary to her observation, William Campbell testified that he observed the pizza box on the front floorboard. It is with regard to Mr. Campbell's testimony that we are asked to address the first issue on appeal.

Campbell stated that he heard the collision, went to the scene, and arrived after Floyd Steinmetz was out of his car. Campbell testified that he asked Steinmetz what happened and that Steinmetz told

him the pizza fell on the floorboard and when he reached to pick it up, "there was nothing he could do." Campbell admitted that he never told the investigating officers of Steinmetz' comment about the pizza. At trial he stated that the person to whom he initially mentioned the comment was his wife. This testimony was impeached by a statement in Campbell's deposition which read: "I ain't even told my wife." Campbell revealed Floyd Steinmetz' comment about a year after the accident and a year prior to trial.

Approximately one year before the trial, William Campbell was arrested due to his involvement in a fight. H.L. Pulley, James Pulley's father, was one of the jailors on duty when Campbell was brought to the jail. While at the jail Campbell told Pulley of the comment he allegedly heard Floyd Steinmetz make. Steinmetz argues on appeal that if Campbell's testimony were accepted, and if the jury believed that the pizza was in the front seat, then perhaps the jury believed that Steinmetz was distracted by the pizza and was partially responsible for the accident. Steinmetz' counsel argues that in his opening statement, the court erroneously limited his ability to comment on the credibility and bias of William Campbell. The dialogue that took place at trial regarding this issue was:

"MR. SCHMIDT: The evidence will show that H.L. Pulley knows Mr. Campbell because when Mr. H.L. Pulley was a Marion Police Officer and William Paul Campbell was going up [sic], he had some little problems and—.

MR. FERRELL: Your honor, I object, and I have a motion to make.

THE COURT: Okay. I'm going to sustain the objection. Hold the motion until he finishes.

MR. FERRELL: Yes, sir.

THE COURT: Go ahead. I don't want any discussion of any problems with the police.

MR. SCHMIDT: Okay.

THE COURT: You're to disregard any of that. There's no evidence of that."

During closing arguments the court sustained James Pulley's counsel's objection to any reference of William Campbell being incarcerated. The discourse was as follows:

"What do we know about Paul Campbell? *** We know that he was in jail and the first time—.

MR. FERRELL: I object to that, your honor. There's no evidence of that. I move that be stricken.

THE COURT: Sustained. Strike the reference to the jail. He

wasn't in jail."

Floyd Steinmetz' attorney argues he was precluded from arguing that H.L. Pulley became acquainted with Campbell due to Campbell getting into trouble with the law, and furthermore, that he was barred from telling the jury that Campbell first related his story regarding the accident while at the jail where H.L. Pulley was a jailor. Floyd Steinmetz argues on appeal that the trial court erred in restricting his opening statement and closing argument in such fashion.

■■ ■ Considerable latitude must be afforded counsel in opening statement or closing argument. (*Northern Trust Co. v. Skokie Valley Community Hospital* (1980), 81 Ill. App. 3d 1110, 1124, 401 N.E.2d 1246, 1258.) In the instant case, during opening statements, the court admonished counsel that there was to be no discussion of any problems William Campbell had with the police. The court did not prohibit counsel from arguing that William Campbell became acquainted with H.L. Pulley while at the jail where Pulley was a jailor. The court properly excluded reference to William Campbell being in jail or being in trouble with the police. Such evidence was not presented at trial, and comments referring to such evidence were properly excluded. No statement should be made in counsel's opening remarks to the jury which counsel does not intend to prove or cannot prove. *Gillson v. Gulf, Mobile & Ohio R.R. Co.* (1969), 42 Ill. 2d 193, 197, 246 N.E.2d 269, 272.

In addition, the trial court properly sustained counsel's objection during closing argument which barred any reference to William Campbell having been in jail. We recognize that counsel in closing statement may be vigorous and eloquent and make fair comment upon the evidence. (*Schwedler v. Galvan* (1977), 46 Ill. App. 3d 630, 641-42, 360 N.E.2d 1324, 1332, citing *Darling v. Charleston Community Memorial Hospital* (1964), 50 Ill. App. 2d 253, 336, 200 N.E.2d 149, 190, *aff'd* (1965), 33 Ill. 2d 326, 211 N.E.2d 253, *cert. denied* (1966), 383 U.S. 946, 16 L. Ed. 2d 209, 86 S. Ct. 1204.) But this does not give him the right to argue facts not in evidence. (*Schwedler v. Galvan* (1977), 46 Ill. App. 3d 630, 642, 360 N.E.2d 1324, 1332.) At trial, the only evidence as to William Campbell's incarceration was his statement that he "was up there [at the jail] when he went into a fight, and I was getting ready to go up, and I'd asked him, I said, 'how's Jimmy doing now?' " Mr. Campbell was never asked if he had been arrested or if he had been incarcerated. Although in closing argument counsel may properly draw inferences from the evidence, he may not create his own evidence. (*Champion v. Knasiak* (1974), 25 Ill. App. 3d 192, 203, 323 N.E.2d 61, 71.) We hold, therefore, that the trial court

did not err in sustaining the objection to any references of William Campbell's incarceration.

We next address the allegation raised by Floyd Steinmetz on appeal that Pat Samples' attorney made a judicial admission during opening statement which is binding on Samples' case. The remark made during Samples' attorney's opening statement was:

"I think it's clear, the evidence will show that the accident did, in fact, occur in the southbound lane. The red car did, in fact, stray over into the southbound lane."

Samples' attorney, Mr. Austin, argues on appeal that there was no clear and unequivocal testimony as to how the accident occurred. Attorney Austin maintains that the statement made by him merely reflected what he thought the evidence would show.

■ It is true that a clear admission of a material fact by counsel in opening statements is binding upon his client. (*Standard Management Realty Co. v. Johnson* (1987), 157 Ill. App. 3d 919, 924, 510 N.E.2d 986, 990.) However, what constitutes a judicial admission must be decided under the circumstances in each case, and before a statement can be held to be such an admission, it must be given a meaning consistent with the context in which it is found. *Standard Management Realty Co.*, 157 Ill. App. 3d at 925, 510 N.E.2d at 990.

■ Attorney Austin's opening statement described his theory of how the accident occurred. Mr. Austin prefaced his belief that the vehicle driven by James Pulley drifted into the oncoming lane of traffic with the phrase: "I think it's clear, the evidence will show." Floyd Steinmetz cites *Stone v. City of Arcola* (1989), 181 Ill. App. 3d 513, 536 N.E.2d 1329, as authority in arguing that the clear admission of material fact in opening statement by Samples' attorney was binding on Samples as a judicial admission. *Stone v. City of Arcola* is distinguishable from the instant case in that counsel in *Stone* admitted in his opening remarks: "Now, the City has retained liquidated damages and actually, according to the counterclaim, we have also withheld in payments $6,338." (*Stone*, 181 Ill. App. 3d at 532, 536 N.E.2d at 1341.) Counsel in that case did not preface his admission with a qualifier or otherwise acknowledge that his remarks were based on his belief of what he felt the evidence would show. Counsel's statement in that case is clearly distinguished from the statement of counsel in the instant case that he believed the evidence would show that the red car was in the southbound lane. We find that no judicial admission was made by Samples' attorney in his opening statement.

The next issue on appeal concerns the propriety of admitting into evidence the testimony of an accident reconstruction expert, Dr. Wil-

liam Orthwein. At trial, prior to Dr. Orthwein's testimony, Floyd Steinmetz called State trooper Roger Walker as a witness. Officer Walker, an Illinois State trooper for 19 years, arrived at the scene of the accident before either vehicle was moved. Prior to examining the scene, he had worked on approximately 3,500 traffic accident cases, 200 of which he investigated as a reconstruction officer. Officer Walker testified as to his observations of the position of the vehicles and the debris in the roadway. It wasn't until after Dr. Orthwein was recognized as a reconstruction expert and testified as to his opinion regarding the point of impact of the vehicles that Officer Walker was tendered as an accident reconstruction expert. The court also recognized the State trooper as a reconstruction expert, whereupon Officer Walker gave his opinion that the impact occurred in the southbound lane of traffic.

James Pulley called Dr. William Orthwein, a mechanical engineer, as a witness. An offer of proof was made, and objections were entertained by the court concerning whether or not to allow the doctor to testify as a reconstruction expert since there was eyewitness testimony as to point of impact. The court overruled the objections, stating that notwithstanding the eyewitness testimony as to the point of impact, Dr. Orthwein's testimony would be admitted. The court reasoned:

> "[N]ow whether the jury wants to believe him or not is up to them. They have the other version before them. *** The mass difference in these two vehicles travelling at the same speed in a curve and the principles of physics acting upon these vehicles to reconstruct the point of impact relative to the gouge marks and where they ended up, it is necessary that the jury have somebody to explain these principles to them."

At trial Dr. Orthwein testified that he reviewed the reconstruction police report, State trooper Tregoning's report, and photographs of the accident scene, and based upon these items he came to certain conclusions and formed certain opinions. Dr. Orthwein was asked on direct examination whether he had an opinion, based upon his expertise as an engineer, as to where with reference to the center line the two vehicles came into contact with one another. Dr. Orthwein testified that in his opinion the collision occurred in the northbound lane, which would be east of the center line, subject to an error factor of 38 inches either way.

Floyd Steinmetz contends that the opinion testimony of Dr. Orthwein should have been excluded because of the rule against reconstruction testimony being used as a substitute for eyewitness testi-

mony and because the testimony did not involve an issue that was beyond the ken of the average juror. *Plank v. Holman* (1970), 46 Ill. 2d 465, 264 N.E.2d 12; *McGrath v. Rohde* (1972), 53 Ill. 2d 56, 289 N.E.2d 619.

We will discuss the law on the admissibility of reconstruction testimony in some detail because of our concern that a rule of exclusion is too often applied solely because of the presence of eyewitnesses and because of our further concern that the courts have created exceptions to the limited rule of admissibility for reconstruction testimony that are unnecessary if the problem is viewed in the overall context of opinion evidence.

Opinion testimony, while more frequently used in modern times, is certainly no newcomer to the law. In 1902 Learned Hand published an article (Hand, *Historical & Practical Considerations Regarding Expert Testimony*, 15 Harv. L. Rev. 40 (1901-02) (hereinafter *Historical*)) in which he traced the development of opinion evidence in general. Judge Hand pointed out:

> "It is common learning today that originally and indeed for many years the jury had no witnesses present before them at all. They went about before or during the trial informing themselves as they might of the facts at issue. Not until the middle of the fifteenth century was even the practice of summoning witnesses well settled as an incident to the trial, and it was still later that any compulsory process became available." (*Historical*, 15 Harv. L. Rev. at 44.)

Hand then examined the problem which confronted, and continues to confront, jurors who must decide cases involving questions of specialized knowledge. Judge Hand found that early courts utilized the practice of impaneling a special jury whose members were experts in the subject matter of the case that they were to decide. (*Historical*, 15 Harv. L. Rev. at 42.) This practice continued for approximately 300 years (1350-1650). (*Historical*, 15 Harv. L. Rev. at 43.) Judge Hand didn't suggest this as a practical solution to modern day concerns, although the practice may be reflected in the present-day use of regulatory commissions. The next, and overlapping, historical development was the utilization by the court, for its elucidation, of witnesses skilled in a particular area. (*Historical*, 15 Harv. L. Rev. at 44.) This procedure was used by judges who had some question before them that required expert knowledge in various fields, *e.g.*, grammarians skilled in Latin or merchants familiar with the practice of using promissory notes. (*Historical*, 15 Harv. L. Rev. at 43.) The court would apparently receive the expert's assistance, make determinations based

upon that evidence, and then deliver its finding as a fact to the jury. *Historical,* 15 Harv. L. Rev. at 46.

The next logical step was to allow an expert to express his opinion directly to the jury. Judge Hand found that this procedure was clearly established by the early 1800's. *Historical,* 15 Harv. L. Rev. at 49.

Dean Wigmore has also traced the development of opinion evidence in general, and has been critical of rules of exclusion:

"The opinion rule day by day exhibits its unpractical subtlety and its useless refinement of logic. Under this rule we accomplish little by enforcing it, and we should do no harm if we dispensed with it. We accomplish little, because, from the side on which the witness appears and from the form of the question, his answer, i.e., his opinion, may often be inferred. We should do no harm, because, even when the final opinion or inference is admitted, the inference amounts in force usually to nothing unless it appears to be solidly based on satisfactory data, the existence and quality of which we can always bring out, if desirable, on cross-examination. Add to this the possibility that under illiberal application of the rule and illiberal practice as to new trials, a single erroneous ruling upon the single trifling answer of one witness out of a dozen or more in trial occupying a day might overturn the whole result and cause the absurdly unjust effect of double expense of time, money, and effort. Add, finally, the utter impossibility of a consistent application of the rule, and the consequent uncertainty of the law, and we understand how much more it makes for injustice rather than justice. It has done more than any one rule of procedure to reduce our litigation towards a state of legalized gambling." 7 Wigmore, Evidence §1929, at 39 (Chadbourn rev. 1978).

While Wigmore's recommendation of abolishing the rule has been referred to (see *State Farm Mutual Automobile Insurance Co. v. Short* (1970), 125 Ill. App. 2d 97, 105-06, 260 N.E.2d 415, 419), it has obviously not been adopted. In fact, and particularly with regard to reconstruction testimony, it has been studiously ignored.

The courts' reluctance to allow reconstruction testimony has not been without critical comment.

"In any given trial, what is fact and what is opinion depends upon which statement is specific enough to allow the jury to draw their own inferences from facts. The statement: 'He was driving carelessly'. may be held to be opinion when compared with the statement: 'He was driving on the wrong side of the

road;' and that statement may seem like opinion when compared with 'He was driving on the left side of the road on a two-lane highway going north.' Speaking of 'compared to what,' query: Which would be more reliable in a contest over a disputed accident—(1) an expert opinion based on skid marks, extent of vehicle damage, final position of vehicles on highway, and, in a proper case, an expert's speed estimate of 35 m.p.h., or (2) lay eyewitness testimony that the vehicle was going 'fast'? Still, there ought to be limits to trial by expert.

Nonessential reconstruction testimony may waste time and presents a specter that the very presence of the expert will unduly impress the jury far beyond the value of his testimony without corresponding benefit of adding anything worthwhile or helpful." Burns, *Evidence: The Role of Reconstruction Experts in Witnessed Accident Litigation*, 22 De Paul L. Rev. 7, 14 (1972).

We will now turn from our brief review of the commentators to an examination of cases. At common law every witness was prohibited from giving his opinion. (*Carter v. Boehn* (1776), 3 Burr. 1905.) This absolute rule was in line with the rules of evidence on the competency of witnesses who must generally have personal knowledge of the subject matter of their testimony. (2 Wigmore, Evidence §§652, 657 (Chadbourn rev. 1979).) The original rule may seem unduly restrictive in today's complex society when it seems that even the most simple cases have at least one expert witness, but as a basic principle it does make good sense. Why should a witness be allowed to state, "I think (or in my opinion) the horse ran away with the wagon" if he wasn't there, wasn't able to see, hear or be brushed by the breeze created by the rapidly moving wagon? This absolute rule was liberalized, and it became the practice to permit the use of expert testimony, but such testimony was limited to subjects where only persons with special skill and knowledge were capable of making correct judgments. (*Yarber v. Chicago & Alton Ry. Co.* (1908), 235 Ill. 589, 85 N.E. 928.) Implicit in the relaxation of the rule was an additional factor: the expert's knowledge must have been of assistance to the fact finder in its resolution of the dispute. (2 Wigmore, Evidence §557 (Chadbourn rev. 1979).) In the earlier cases this assistance was allowed only so far, *e.g.*, an expert was not permitted to give an opinion on the ultimate issue in the case because it was felt that this invaded the province of the jury. *Keefe v. Armour & Co.* (1913), 258 Ill. 28, 101 N.E. 252.

The original absolute rejection of expert testimony and its later

gradual, begrudging acceptance may have had more than a strict evidentiary basis. It may also have been a reflection of popular attitudes that existed toward experts at the time and still exist today: "One who can take something you already know and make it sound confusing." (Anon., quoting *Webster's New World Dictionary of Quotable Definitions* 186 (E. Brussell 2d ed. 1988).) This suggestion is supported by a line from a 1920 supreme court opinion, *Opp v. Pryor*, wherein the court said that "all too often a lawyer can easily find an accomodating expert because the expert's opinion simply is a natural expected result of employment." *Opp v. Pryor* (1920), 294 Ill. 538, 545-46, 128 N.E. 580, 583.

Whatever the reason or reasons for the rejection and/or limitation to non-ultimate issue conclusions, the restrictive rules were relaxed in *Miller v. Pillsbury Co.* (1965), 33 Ill. 2d 514, 211 N.E.2d 733. In *Miller*, a case arising out of a vehicular collision involving three trucks, there were no eyewitnesses qualified to testify. The court affirmed the admission of expert evidence as to the point of impact, and declared that expert reconstruction testimony should be admissible where it is necessary to rely on knowledge and application of principles of physics, engineering, and other sciences beyond the ken of the average juror. The *Miller* court recognized that permitting reconstruction experts to testify would entail some conflict with the ultimate issue prohibition, but reasoned that since the jury could accept or reject the testimony, their province was not invaded.

The more liberal rule of *Miller* was restricted in *Plank v. Holman* (1970), 46 Ill. 2d 465, 264 N.E.2d 12, where the court after quoting from *Miller* stated: "However, reconstruction testimony may not be used as a substitute for eyewitness testimony where such is available." (*Plank*, 46 Ill. 2d at 470, 264 N.E.2d at 15.) The absolute prohibition in the above sentence is immediately followed by: "Whether it may be used *in addition* to eyewitness testimony is determined by whether it is *necessary* to rely on knowledge and application of principles of science beyond the ken of the average juror." (Emphasis added.) (*Plank*, 46 Ill. 2d at 471, 264 N.E.2d at 15.) The meaning of these two sentences is somewhat unclear. The first appears to restrict *Miller* to its facts, *e.g.*, in the presence of eyewitness testimony reconstruction evidence is impermissible; but, the second sentence conditionally approves reconstruction testimony if it is necessary to rely on knowledge beyond the ken of the average juror.

*Plank* was followed in 1972 by *McGrath v. Rohde* (1972), 53 Ill. 2d 56, 289 N.E.2d 619, which cited and quoted the sentences referred to above and then went on to hold that the trial court properly excluded

the expert testimony because, "[t]he questions for the jurors here [do] not *require* a scientific knowledge beyond that of typical jurors." (Emphasis added.) *McGrath*, 53 Ill. 2d at 61, 289 N.E.2d at 623.

After *McGrath* the appropriate meaning to be ascribed to these two sentences was left to the appellate courts for the next several years and, not surprisingly, different results were reached. Some courts paid greater deference to the first quoted sentence from *Plank* and forbade reconstructionists if eyewitness testimony was available. (*National Bank v. Pickens* (1972), 8 Ill. App. 3d 58, 61, 289 N.E.2d 64, 66; *Misch v. Meadows Mennonite Home* (1983), 114 Ill. App. 3d 792, 799, 449 N.E.2d 1358, 1363; *Trillet v. Bachman* (1981), 96 Ill. App. 3d 477, 481, 421 N.E.2d 580, 584.) Most of these cases offer little discussion of the principles beyond a citation to *Plank* and *McGrath*.

Other courts made reference to the *Plank* and *McGrath* cases, but then recognized various exceptions to the general rules laid down therein. Several of these exceptions are as follows: an exception permitting the testimony because the factual issue was not precisely addressed by the eyewitness testimony (*People v. Wolfe* (1983), 114 Ill. App. 3d 841, 848, 449 N.E.2d 980, 986); an exception allowing expert testimony for the injuries sustained in the *second impact* (*Seward v. Griffin* (1983), 116 Ill. App. 3d 749, 761-62, 452 N.E.2d 558, 568); an exception allowing expert opinion if the eyewitness testimony was sufficiently confusing (*Ketchum v. Dura-Bond Concrete, Inc.* (1989), 179 Ill. App. 3d 820, 831, 534 N.E.2d 1364, 1371); an exception where there was lack of reliable eyewitness testimony (*People v. McDermott* (1986), 141 Ill. App. 3d 996, 1007, 490 N.E.2d 1293, 1300); an exception where the expert was not actually recreating the entire accident, but was only testifying as to the point of impact (*Kassela v. Stonitsch* (1978), 57 Ill. App. 3d 817, 823, 373 N.E.2d 608, 613); an exception where the expert did not explicitly recreate the accident, but testified to his calculations of braking, stopping, skidding distances, braking effects and braking time (*Burke v. Toledo, Peoria & Western R.R. Co.* (1986), 148 Ill. App. 3d 208, 213, 498 N.E.2d 682, 686; *Jamison v. Lambke* (1974), 21 Ill. App. 3d 629, 635, 316 N.E.2d 93, 97; *Finfrock v. Eaton Asphalt Co. Inc.* (1976), 41 Ill. App. 3d 1020, 1023, 355 N.E.2d 214, 217); an exception where there was no eyewitness other than the defendant (*Fakhoury v. Vapor Corp.* (1987), 154 Ill. App. 3d 531, 537, 507 N.E.2d 50, 54); and an exception where there was only one eyewitness (*Ralston v. Plogger* (1985), 132 Ill. App. 3d 90, 99, 476 N.E.2d 1378, 1384).

The above list is a sampling of exceptions to the general rule of

reluctant admissibility of reconstruction evidence, but the development has not all been toward the creation of exceptions. The courts have also engrafted additional restrictions: "[R]econstruction [testimony] may not be used to *impeach* otherwise credible [eyewitness] testimony." (Emphasis added.) (*National Bank v. Pickens* (1972), 8 Ill. App. 3d 58, 61, 289 N.E.2d 64, 66; see also *Whitman v. Lopatkiewicz* (1987), 152 Ill. App. 3d 332, 338-39, 504 N.E.2d 243, 247.) The most stringent restriction is found in *Iverson v. Iverson*: "The testimony of a reconstruction expert, however, should *never* be used as a substitute for eyewitness testimony." (Emphasis added.) (*Iverson v. Iverson* (1977), 56 Ill. App. 3d 297, 304-05, 370 N.E.2d 1135, 1142.) The reader might want to compare the above-quoted language from *Iverson* with the court's statement in *People v. Wonders* (1985), 130 Ill. App. 3d 1, 4, 473 N.E.2d 976, 979: "However, in cases where eyewitness testimony *is available*, the trial judge may in his discretion admit accident reconstruction testimony." (Emphasis added.)

After one has fought his way through the myriad of exceptions only to stumble upon the additional restrictions, it is no wonder that such esteemed experts on evidence as Cleary and Graham have commented that "there appears to be a certain amount of confusion as to when reconstruction testimony may be received when eyewitness testimony is available." (E. Cleary & M. Graham, Handbook of Illinois Evidence, §703.2, at 477 (4th ed. 1984).) In fact, Cleary and Graham's calculated understatement of the degree of confusion can be likened to the first mountain man who stumbled upon the Grand Canyon and exclaimed, "Golly, a gully!"

Perhaps the most extensive analyses on this point are to be found in the cases of *Abramson v. Levinson* (1969), 112 Ill. App. 2d 42, 250 N.E.2d 796, *cert. denied* (1970), 398 U.S. 950, 26 L. Ed. 2d 290, 90 S. Ct. 1868, and *Dauksch v. Chamness* (1973), 11 Ill. App. 3d 346, 296 N.E.2d 592. The *Abramson* case listed four factors which should be demonstrated before there is a ruling in favor of admissibility:

"1. The expert has the necessary expertise as a result of education, training and experience in the specific area about which he expresses an opinion,

2. The area of inquiry should require the employment of principles of physics, engineering or other science or scientific data beyond the ken of the average juror,

3. The opinion of the expert cannot be naked, but must come clothed in evidentiary facts in the record, the inferences reasonably arising therefrom and must be elicited by hypothetical questions containing substantially all of the undisputed facts

in evidence relating to the issue about which an opinion is sought, and

4. There must be a need apparent from the record in the case for scientific knowledge, expertise and experience which will aid the jury to a correct and a just result." *Abramson,* 112 Ill. App. 2d at 50, 250 N.E.2d at 800-01.

*Dauksch* refers only to three prerequisites for admissibility:

"The trial judge must, for instance, determine whether expert reconstruction testimony or opinion is necessary, that in order to arrive at a just verdict the jury must be assisted by testimony regarding knowledge of physics or the sciences beyond their ordinary ken, that the proffered witness is sufficiently possessed of the requisite qualifications as an expert and that there are sufficient physical data upon which he may base his conclusions and opinions." *Dauksch,* 11 Ill. App. 3d at 352, 296 N.E.2d at 596-97.

It would appear that requisites two and four in the *Abramson* case could be merged into the first-named requisite in *Dauksch.* It would further appear that the third requisite in each case, evidentiary facts in the record, has been weakened by the supreme court's decision in *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322. (See *Coffey v. Hancock* (1984), 122 Ill. App. 3d 442, 451, 461 N.E.2d 64, 71.) There would thus appear to be two major prerequisites necessary: appropriate qualifications of the expert and a requirement that the jury may be assisted by testimony regarding knowledge beyond that which they would ordinarily have.

These requirements do not seem significantly different from the general rule on the admissibility of expert testimony and yet the courts have often either applied a special rule to reconstruction testimony where eyewitnesses are available or have paid lip service to the rule and then created an exception to it.

An examination of the dichotomy of the treatment of experts that exists between medical malpractice and vehicular accident cases might be of some assistance in determining why this apparent confusion in the cases has arisen. In most, if not all, medical malpractice cases there are eyewitnesses to the significant events. Doctors, nurses, other hospital personnel, and in some instances, family members describe what they saw, heard or felt. Yet in medical malpractice cases expert testimony is not only permitted, it is mandated to establish deviation from the standard of care except in certain limited circumstances. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423, 328 N.E.2d 301, 304-05.) In an automobile case, on the other hand, if

there is eyewitness testimony, an expert's opinion is not only not mandated, it is very often prohibited. Why is there such a difference in treatment? We submit that in the medical malpractice situation the experts, who are generally medical doctors, traditionally have had a great deal of additional training beyond that of the fact finder and there is really no serious question as to their qualifications. The qualifications of the witnesses in reconstruction situations have not always been of the same caliber, particularly in regard to academic credentials. Many reconstruction experts are police officers who have no particular training in the field of physics, and the courts' reluctance to accept their testimony has been based at least in part on the witnesses' inability to provide expertise in a truly scientific field. (*Deaver v. Hickox* (1967), 81 Ill. App. 2d 79, 87, 224 N.E.2d 468, 471.) The other difference between the two types of cases lies in the degree of complexity of the subject matter. In medical malpractice situations, it is extremely rare that the fact finder would not be assisted by the expert's explanation. In contrast, a more fundamental reason for the exclusion of reconstruction testimony has been the courts' feeling that jurors are well aware of driving situations and do not require the assistance of experts in reaching their decisions. (*Payne v. Noles* (1972), 5 Ill. App. 3d 433, 283 N.E.2d 329.) The fact, however, that *some* witnesses may not be properly qualified as experts or that *some* opinions may not assist the fact finder does not justify a slavish adherence to a rule that excludes reconstruction evidence in *all* cases in which there is eyewitness testimony.

One further point that needs to be addressed is the question of whether or not an expert's testimony is admissible if it will be *of assistance* to the jury as opposed to whether it must be *necessary* for them to reach their decision. This question was decided in *Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.* (1971), 49 Ill. 2d 118, 273 N.E.2d 809, with the majority holding that the proper requirement was that the testimony should be admissible if it would be *of assistance* to the jury.

While *Merchants National Bank* apparently relaxed the rule against the admissibility of reconstruction testimony, the defendant cites the later case of *Peterson v. Lou Bachrodt Chevrolet Co.* (1979), 76 Ill. 2d 353, 392 N.E.2d 1, for the proposition that reconstruction testimony is still not a favorite of the courts in cases involving eyewitnesses, and we acknowledge that proposition. We also note, however, that *Peterson* is a fairly fact-specific holding. The court held: "Because we believe that the speed of an automobile is not a matter beyond the ken of the average juror [citation], we hold that the circuit

court erred in admitting reconstruction testimony." (*Peterson*, 76 Ill. 2d at 359, 392 N.E.2d at 3.) This holding has obviously not changed the result in *Merchants National Bank*.

 █ We hold, therefore, that the admissibility of reconstruction evidence is to be determined upon the rules announced by the supreme court for opinion evidence. Is the expert qualified in the field, and will his testimony aid the fact finder in the resolution of the dispute? If the answer to these two questions is in the affirmative, then the testimony is admissible. The presence or absence of eyewitnesses thus becomes not the sole criterion for the determination of admissibility of reconstruction testimony, but only one of the criteria, and it obviously applies only to the second of the questions dealing with the admissibility of the testimony. When the review of the cases is reexamined with this analysis in mind, it becomes apparent both that the results would have been identical, and that they would be based not upon any new rule (or exception to one) extending admissibility, but instead on a return to the general rule on the admissibility of opinion evidence.

In this as in other evidentiary matters the trial court must be granted discretion in its ruling. We find no error in the judge's ruling in this case. The expert, Dr. Orthwein, was properly qualified and, as the trial court pointed out, his testimony could be of assistance to the fact finder. Therefore it was properly admitted.

We next address a procedural issue raised by Floyd Steinmetz. During the pretrial phase of this case the trial judge directed that each plaintiff would be required to prove his or her own case. Although the cases were consolidated, they were actually presented as five separate cases to the same jury. The cases were presented in the following order: (1) Floyd Steinmetz v. James Pulley and Henry Pulley; (2) Pat Samples, as administrator of the estate of Gilbert Lee Allen, v. James Pulley and Floyd Steinmetz; (3) Sheryl Augenstein v. James Pulley and Floyd Steinmetz; (4) James Pulley v. Floyd Steinmetz; (5) Henry Pulley v. Floyd Steinmetz.

Floyd Steinmetz filed a motion for directed verdict at the close of each of the cases of Gilbert Lee Allen and Sheryl Augenstein. The trial court determined that all motions for directed verdict would be presented after all the evidence was concluded. When Steinmetz' counsel argued for a directed verdict as to those two plaintiffs, he requested that the court disregard the testimony of Dr. Orthwein since it was not presented until after the Augenstein and Allen cases had been presented. The court denied all motions for directed verdicts.

Floyd Steinmetz argues that the trial court failed to follow the

procedural rules it had established, namely, that each plaintiff would be required to prove his or her own case. He argues that the trial court improperly considered Dr. Orthwein's testimony in making its decision regarding the motions for directed verdicts in the Augenstein and Allen cases. Counsel for Pat Samples, the administrator of the estate of Gilbert Lee Allen, argues that Steinmetz was completely aware that all evidence presented would be used in consideration of all cases. Samples' counsel makes specific reference to the record where the trial court and counsel for the parties discussed how the evidence presented in each case would be used in reference to the other cases:

"MR. GIAMANCO: At some time in the early afternoon we will be putting our aspect of the case on with respect to liability. I don't intend to call a number of these witnesses again and ask them the same questions, but on the record I'd like, outside the presence of the—Well, in the presence of the jury I'd like to adopt the testimony of those witnesses.

THE COURT: Fine. I think you should, and I think Mr. Austin should.

MR. AUSTIN: It's my intention—Do we adopt it all? The direct examination, the cross examination? Or is it just adopted for us by operation of law?

THE COURT: I think it's adopted for you by operation of law."

Counsel for James Pulley asserts that since Floyd Steinmetz did not object to the court considering the evidence in each case as to every other case he waived his objection. At the close of all the evidence a hearing was conducted to consider the motions for directed verdicts. The court at that time stated:

"Now I want the record to show, and all of you to understand, due to the fact that the court on its own motion has since trifurcated the issues in this case, and that we're adopting evidence of other attorneys, and the jury is going to be instructed to consider all of the evidence, that I am going to consider all of the evidence in this case as to each and every party."

Counsel for Floyd Steinmetz took exception to the court considering Dr. Orthwein's testimony as to the Augenstein and Allen cases. While we agree that in order to preserve an issue for appeal, objection must be made in the trial court (*Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 324 N.E.2d 417), Floyd Steinmetz did object to the consideration of Dr. Orthwein's testimony in his motion for directed verdicts. We therefore will address the substantive issue of whether the court

acted improperly in considering Dr. Orthwein's testimony in determining the motions for directed verdicts.

■■ ■ It is well recognized that consolidation is permitted under section 2—1006 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1006). Inherent in the power to consolidate is the authority to integrate evidence at a joint trial in the interest of convenience and economy. (*Colgan v. Rae-Ann Electric Co.* (1980), 91 Ill. App. 3d 386, 392, 414 N.E.2d 1343, 1347.) The record reflects that the parties were aware that all of the evidence would be considered with regard to each case. Furthermore, as the integration of evidence in a consolidated trial is permissible, we hold that the trial court did not act improperly in considering the testimony of Dr. Orthwein in making its decision with regard to the motions for directed verdicts.

The final issue for our consideration is whether the trial court erred in instructing the jury that defendant Floyd Steinmetz had to be found at least one percent at fault for the accident during the contribution phase of deliberations. At the close of all of the evidence and after closing arguments were given by counsel, the jury first deliberated on the issue of liability. The jury found in favor of each of the plaintiffs and against each of the defendants. Instructions were then given to the jury for their determination of contribution and reduction of damages. In addressing the jury's consideration of James Pulley's contribution claim against Floyd Steinmetz, the judge stated: "I submit to you that in this case you must reduce those damages at least one percent." The jury thereupon retired for deliberation on the issues of contribution and contributory negligence. Proceedings were then held out of the hearing and presence of the jury, and counsel for Floyd Steinmetz objected to the court's instruction.

Counsel for James Pulley claims Floyd Steinmetz waived his objection to the instruction since objection was not made until after the jury retired to deliberate. The statement made by the judge in his instruction to the jury was made in the presence of the jury without prior notice to the attorneys. Floyd Steinmetz' attorney may well have thought that it would be disadvantageous to object in the jury's presence. The objection was specifically made by counsel immediately after the jury retired to deliberate, and, under the circumstances, we consider that sufficient.

■■ In support of the trial judge's instruction, counsel for James Pulley argues that the only way the jury could make a finding of zero percent contributory negligence would be if there had been a prior consistent verdict finding one defendant not guilty as to the claims of negligence of the other defendant, which obviously did not occur. The

purpose of jury instructions is to convey to the jurors the correct principles of law applicable to the evidence which has been submitted to them. (*LeMaster v. Chicago Rock Island & Pacific R.R. Co.* (1976), 35 Ill. App. 3d 1001, 1019, 343 N.E.2d 65, 80.) The test is whether, taken as a whole, the instructions are clear enough so as not to mislead and whether they fairly and accurately state the applicable law. *People v. Falley* (1937), 366 Ill. 545, 551, 9 N.E.2d 324, 327; *Friedman v. Park District* (1986), 151 Ill. App. 3d 374, 388, 502 N.E.2d 826, 837.

Floyd Steinmetz' concern is that the instruction conveyed the false impression that he was liable on the contribution claim and comparative fault issue before the jury had the opportunity to consider that aspect of the case. We are not persuaded that he was prejudiced by the court's remark. Here the jury initially retired to deliberate the issue of liability of the parties. Verdicts were returned against both defendants. The jury was thereafter instructed to assess percentages of fault. The judge's remark was made after the court read the instruction about an assessment of Floyd Steinmetz' contributory negligence. The jury was instructed as to how they should determine and assess contributory negligence as to both Floyd Steinmetz and James Pulley. The instructions taken as a whole fully informed the jury of the applicable law of the case. The verdict could not have been based on any misunderstanding because Floyd Steinmetz could not be found zero percent contributorily negligent where the verdicts found liability against each defendant. We find no cause for reversal here.

Therefore the judgment of the trial court is affirmed.

Affirmed.

WELCH and HARRISON, JJ., concur.